DALTON, SECRETARY OF THE NAVY, ET AL. *v.*
SPECTER ET AL.

No. 93–289.   Argued March 2, 1994—Decided May 23, 1994

REHNQUIST, C. J., delivered the opinion of the Court, Part II of which was unanimous, and in the remainder of which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 477. SOUTER, J., filed an opinion concurring in part and concurring in the judgment, in which BLACKMUN, STEVENS, and GINSBURG, JJ., joined, *post*, p. 478.

*Solicitor General Days* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, John F. Manning,* and *Douglas N. Letter.*

*Senator Arlen Specter, pro se,* argued the cause for respondents. With him on the brief were *Bruce W. Kauff-*

man, *Mark J. Levin, Camille Spinello Andrews,* and *Thomas E. Groshens.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents sought to enjoin the Secretary of Defense (Secretary) from carrying out a decision by the President to close the Philadelphia Naval Shipyard.[1] This decision was made pursuant to the Defense Base Closure and Realignment Act of 1990 (1990 Act or Act), 104 Stat. 1808, as amended, note following 10 U. S. C. § 2687 (1988 ed., Supp. IV). The Court of Appeals held that judicial review of the decision was available to ensure that various participants in the selection process had complied with procedural mandates specified by Congress. We hold that such review is not available.

The decision to close the shipyard was the end result of an elaborate selection process prescribed by the 1990 Act. Designed "to provide a fair process that will result in the timely closure and realignment of military installations inside the United States," § 2901(b),[2] the Act provides for three

*Robert J. Cynkar, John B. Rhinelander, Alexander W. Joel, Bernard Petrie,* and *Steven T. Walther* filed a brief for Business Executives for National Security as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New York by *G. Oliver Koppell,* Attorney General, *Jerry Boone,* Solicitor General, *Peter H. Schiff,* Deputy Solicitor General, and *Alan S. Kaufman, Edward M. Scher,* and *Howard L. Zwickel,* Assistant Attorneys General; and for Public Citizen by *Patti A. Goldman, Alan B. Morrison,* and *Paul R. Q. Wolfson.*

[1] Respondents are shipyard employees and their unions; Members of Congress from Pennsylvania and New Jersey; the States of Pennsylvania, New Jersey, and Delaware, and officials of those States; and the city of Philadelphia. Petitioners are the Secretary of Defense; the Secretary of the Navy; and the Defense Base Closure and Realignment Commission and its members.

[2] For ease of reference, all citations to the 1990 Act are to the relevant sections of the Act as it appears in note following 10 U. S. C. § 2687 (1988 ed., Supp. IV).

successive rounds of base closings—in 1991, 1993, and 1995, §2903(c)(1). For each round, the Secretary must prepare closure and realignment recommendations, based on selection criteria he establishes after notice and an opportunity for public comment. §§2903(b) and (c).

The Secretary submits his recommendations to Congress and to the Defense Base Closure and Realignment Commission (Commission), an independent body whose eight members are appointed by the President, with the advice and consent of the Senate. §§2903(c)(1); 2902(a) and (c)(1)(A). The Commission must then hold public hearings and prepare a report, containing both an assessment of the Secretary's recommendations and the Commission's own recommendations for base closures and realignments. §§2903(d)(1) and (2). Within roughly three months of receiving the Secretary's recommendations, the Commission has to submit its report to the President. §2903(d)(2)(A).

Within two weeks of receiving the Commission's report, the President must decide whether to approve or disapprove, in their entirety, the Commission's recommendations. §§2903(e)(1)–(3). If the President disapproves, the Commission has roughly one month to prepare a new report and submit it to the President. §2903(e)(3). If the President again disapproves, no bases may be closed that year under the Act. §2903(e)(5). If the President approves the initial or revised recommendations, the President must submit the recommendations, along with his certification of approval, to Congress. §§2903(e)(2) and (e)(4). Congress may, within 45 days of receiving the President's certification (or by the date Congress adjourns for the session, whichever is earlier), enact a joint resolution of disapproval. §§2904(b); 2908. If such a resolution is passed, the Secretary may not carry out any closures pursuant to the Act; if such a resolution is not passed, the Secretary must close all military installations recommended for closure by the Commission. §§2904(a) and (b)(1).

In April 1991, the Secretary recommended the closure or realignment of a number of military installations, including the Philadelphia Naval Shipyard. After holding public hearings in Washington, D. C., and Philadelphia, the Commission recommended closure or realignment of 82 bases. The Commission did not concur in all of the Secretary's recommendations, but it agreed that the Philadelphia Naval Shipyard should be closed. In July 1991, President Bush approved the Commission's recommendations, and the House of Representatives rejected a proposed joint resolution of disapproval by a vote of 364 to 60.

Two days before the President submitted his certification of approval to Congress, respondents filed this action under the Administrative Procedure Act (APA), 5 U. S. C. § 701 et seq., and the 1990 Act. Their complaint contained three counts, two of which remain at issue.[3] Count I alleged that the Secretaries of Navy and Defense violated substantive and procedural requirements of the 1990 Act in recommending closure of the Philadelphia Naval Shipyard. Count II made similar allegations regarding the Commission's recommendations to the President, asserting specifically that, inter alia, the Commission used improper criteria, failed to place certain information in the record until after the close of public hearings, and held closed meetings with the Navy.

The United States District Court for the Eastern District of Pennsylvania dismissed the complaint in its entirety, on the alternative grounds that the 1990 Act itself precluded

---

[3] Respondents' third count alleged that petitioners had violated the due process rights of respondent shipyard employees and respondent unions. In its initial decision, the United States Court of Appeals for the Third Circuit held that the shipyard employees and unions had no protectible property interest in the shipyard's continued operation and thus had failed to state a claim under the Due Process Clause. Specter v. Garrett, 971 F. 2d 936, 955–956 (1992). Respondents did not seek further review of that ruling, and it is not at issue here.

judicial review and that the political question doctrine foreclosed judicial intervention. *Specter* v. *Garrett*, 777 F. Supp. 1226 (1991). A divided panel of the United States Court of Appeals for the Third Circuit affirmed in part and reversed in part. *Specter* v. *Garrett*, 971 F. 2d 936 (1992) *(Specter I)*. The Court of Appeals first acknowledged that the actions challenged by respondents were not typical of the "agency actions" reviewed under the APA, because the 1990 Act contemplates joint decisionmaking among the Secretary, Commission, President, and Congress. *Id.*, at 944–945. The Court of Appeals then reasoned that because respondents sought to enjoin the implementation of the President's decision, respondents (who had not named the President as a defendant) were asking the Court of Appeals "to review a presidential decision." *Id.*, at 945. The Court of Appeals decided that there could be judicial review of the President's decision because the "actions of the President have never been considered immune from judicial review solely because they were taken by the President." *Ibid.* It held that certain procedural claims, such as respondents' claim that the Secretary failed to transmit to the Commission all of the information he used in making his recommendations, and their claim that the Commission did not hold public hearings as required by the Act, were thus reviewable. *Id.*, at 952–953. The dissenting judge took the view that the 1990 Act precluded judicial review of all statutory claims, procedural and substantive. *Id.*, at 956–961.

Shortly after the Court of Appeals issued its opinion, we decided *Franklin* v. *Massachusetts*, 505 U. S. 788 (1992), in which we addressed the existence of "final agency action" in a suit seeking APA review of the decennial reapportionment of the House of Representatives. The Census Act requires the Secretary of Commerce to submit a census report to the President, who then certifies to Congress the number of Representatives to which each State is entitled pursuant to

a statutory formula. We concluded both that the Secretary's report was not "final agency action" reviewable under the APA, and that the APA does not apply to the President. *Id.*, at 796–801. After we rendered our decision in *Franklin,* petitioners sought our review in this case. Because of the similarities between *Franklin* and this case, we granted the petition for certiorari, vacated the judgment of the Court of Appeals, and remanded for further consideration in light of *Franklin. O'Keefe* v. *Specter,* 506 U. S. 969 (1992).

On remand, the same divided panel of the Court of Appeals adhered to its earlier decision, and held that *Franklin* did not affect the reviewability of respondents' procedural claims. *Specter* v. *Garrett,* 995 F. 2d 404 (1993) *(Specter II).* Although apparently recognizing that APA review was unavailable, the Court of Appeals felt that adjudging the President's actions for compliance with the 1990 Act was a "form of constitutional review," and that *Franklin* sanctioned such review. 995 F. 2d, at 408–409. Petitioners again sought our review, and we granted certiorari. 510 U. S. 930 (1993). We now reverse.

## I

We begin our analysis on common ground with the Court of Appeals. In *Specter II,* that court acknowledged, at least tacitly, that respondents' claims are not reviewable under the APA. 995 F. 2d, at 406. A straightforward application of *Franklin* to this case demonstrates why this is so. *Franklin* involved a suit against the President, the Secretary of Commerce, and various public officials, challenging the manner in which seats in the House of Representatives had been apportioned among the States. 505 U. S., at 790. The plaintiffs challenged the method used by the Secretary of Commerce in preparing her census report, particularly the manner in which she counted federal employees working overseas. The plaintiffs raised claims under both the APA and the Constitution. In reviewing the former, we

first sought to determine whether the Secretary's action, in submitting a census report to the President, was "final" for purposes of APA review. (The APA provides for judicial review only of "*final* agency action." 5 U. S. C. § 704 (emphasis added).) Because the President reviewed (and could revise) the Secretary's report, made the apportionment calculations, and submitted the final apportionment report to Congress, we held that the Secretary's report was "not final and therefore not subject to review." 505 U. S., at 798.

We next held that the President's actions were not reviewable under the APA, because the President is not an "agency" within the meaning of the APA. *Id.,* at 801 ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements"). We thus concluded that the reapportionment determination was not reviewable under the standards of the APA. *Ibid.* In reaching our conclusion, we noted that the "President's actions may still be reviewed for constitutionality." *Ibid.* (citing *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952), and *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935)).

In this case, respondents brought suit under the APA, alleging that the Secretary and the Commission did not follow the procedural mandates of the 1990 Act. But here, as in *Franklin,* the prerequisite to review under the APA— "final agency action"—is lacking. The reports submitted by the Secretary and the Commission, like the report of the Secretary of Commerce in *Franklin,* "carr[y] no direct consequences" for base closings. 505 U. S., at 798. The action that "will directly affect" the military bases, *id.,* at 797, is taken by the President, when he submits his certification of approval to Congress. Accordingly, the Secretary's and Commission's reports serve "more like a tentative recommendation than a final and binding determination." *Id.,* at 798. The reports are, "like the ruling of a subordinate

official, not final and therefore not subject to review." *Ibid.* (internal quotation marks and citation omitted). The actions of the President, in turn, are not reviewable under the APA because, as we concluded in *Franklin,* the President is not an "agency." See *id.,* at 800–801.

Respondents contend that the 1990 Act differs significantly from the Census Act at issue in *Franklin,* and that our decision in *Franklin* therefore does not control the question whether the Commission's actions here are final. Respondents appear to argue that the President, under the 1990 Act, has little authority regarding the closure of bases. See Brief for Respondents 29 (pointing out that the 1990 Act does not allow "the President to ignore, revise or amend the Commission's list of closures. He is only permitted to accept or reject the Commission's closure package in its entirety"). Consequently, respondents continue, the Commission's report must be regarded as final. This argument ignores the *ratio decidendi* of *Franklin.* See 505 U. S., at 800–801.

First, respondents underestimate the President's authority under the Act, and the importance of his role in the base closure process. Without the President's approval, no bases are closed under the Act, see § 2903(e)(5); the Act, in turn, does not by its terms circumscribe the President's discretion to approve or disapprove the Commission's report. Cf. *id.,* at 799. Second, and more fundamentally, respondents' argument ignores "[t]he core question" for determining finality: "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id.,* at 797. That the President cannot pick and choose among bases, and must accept or reject the entire package offered by the Commission, is immaterial. What is crucial is the fact that "[t]he President, not the [Commission], takes the final action that affects" the military installations. *Id.,* at 799. Accordingly, we hold that the decisions made pursuant to the 1990 Act are not review-

able under the APA. Accord, *Cohen* v. *Rice,* 992 F. 2d 376 (CA1 1993).

Although respondents apparently sought review exclusively under the APA,[4] the Court of Appeals nevertheless sought to determine whether non-APA review, based on either common law or constitutional principles, was available. It focused, moreover, on whether the President's actions under the 1990 Act were reviewable, even though respondents did not name the President as a defendant. The Court of Appeals reasoned that because respondents sought to enjoin the implementation of the President's decision, the legality of that decision would determine whether an injunction should issue. See *Specter II,* 995 F. 2d, at 407; *Specter I,* 971 F. 2d, at 936. In this rather curious fashion, the case was transmuted into one concerning the reviewability of Presidential decisions.

## II

Seizing upon our statement in *Franklin* that Presidential decisions are reviewable for constitutionality, the Court of Appeals asserted that "there is a constitutional aspect to the exercise of judicial review in this case—an aspect grounded in the separation of powers doctrine." *Specter II, supra,* at 408. It reasoned, relying primarily on *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952), that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine. Thus, judicial review must be available to determine whether the President has statutory authority "for whatever action" he takes. 995 F. 2d, at 409. In terms of this case, the Court of Appeals concluded that the President's statutory authority to close and realign bases would be lacking if the Secretary and Commission violated the procedural

---

[4] See *Specter* v. *Garrett,* 995 F. 2d 404, 412 (1993) (Alito, J., dissenting); see also *Specter* v. *Garrett,* 777 F. Supp. 1226, 1227 (ED Pa. 1991) (respondents "have asserted that their right to judicial review . . . arises under the Administrative Procedure Act").

requirements of the Act in formulating their recommendations. *Ibid.*

Accepting for purposes of decision here the propriety of examining the President's actions, we nonetheless believe that the Court of Appeals' analysis is flawed. Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority. See, *e. g., Wheeldin* v. *Wheeler,* 373 U. S. 647, 650–652 (1963) (distinguishing between "rights which may arise under the Fourth Amendment" and "a cause of action for abuse of the [statutory] subpoena power by a federal officer"); *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 396–397 (1971) (distinguishing between "actions contrary to [a] constitutional prohibition," and those "merely said to be in excess of the authority delegated . . . by the Congress").

In *Larson* v. *Domestic and Foreign Commerce Corp.,* 337 U. S. 682, 691, n. 11 (1949), for example, we held that sovereign immunity would not shield an executive officer from suit if the officer acted either "unconstitutionally *or* beyond his statutory powers." (Emphasis added.) If all executive actions in excess of statutory authority were *ipso facto* unconstitutional, as the Court of Appeals seemed to believe, there would have been little need in *Larson* for our specifying unconstitutional and ultra vires conduct as separate categories. See also *Dugan* v. *Rank,* 372 U. S. 609, 621–622 (1963); *Harmon* v. *Brucker,* 355 U. S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' *non-constitutional claim* that respondent [Secretary of the Army] *acted in excess of powers granted him by Congress*" (emphasis added)).

Our decision in *Youngstown, supra,* does not suggest a different conclusion. In *Youngstown,* the Government disclaimed any statutory authority for the President's seizure of steel mills. See 343 U. S., at 585 ("[W]e do not understand the Government to rely on statutory authorization for this seizure"). The only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces. *Id.,* at 587. Because no statutory authority was claimed, the case necessarily turned on whether the Constitution authorized the President's actions. *Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority. The case cannot be read for the proposition that an action taken by the President in excess of his statutory authority necessarily violates the Constitution.[5]

The decisions cited above establish that claims simply alleging that the President has exceeded his statutory authority are not "constitutional" claims, subject to judicial review

---

[5] *Panama Refining Co.* v. *Ryan,* 293 U. S. 388 (1935), the other case (along with *Youngstown*) cited in *Franklin* v. *Massachusetts,* 505 U. S. 788 (1992), as an example of when we have reviewed the constitutionality of the President's actions, likewise did not involve a claim that the President acted in excess of his statutory authority. *Panama Refining* involved the National Industrial Recovery Act, which delegated to the President the authority to ban interstate transportation of oil produced in violation of state production and marketing limits. See 293 U. S., at 406. We struck down an Executive Order promulgated under that Act not because the President had acted beyond his statutory authority, but rather because the Act unconstitutionally delegated Congress' authority to the President. See *id.,* at 430. As the Court pointed out, we were "not dealing with action which, appropriately belonging to the executive province, is not the subject of judicial review, or with the presumptions attaching to executive action. To repeat, we are concerned with the question of the delegation of legislative power." *Id.,* at 432 (footnote omitted). Respondents have not alleged that the 1990 Act in itself amounts to an unconstitutional delegation of authority to the President.

under the exception recognized in *Franklin*.[6]  As this case demonstrates, if every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition.  The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.

So the claim raised here is a statutory one: The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations.  The exception identified in *Franklin* for review of constitutional claims thus does not apply in this case.  We may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA.  See *Dames & Moore* v. *Regan*, 453 U. S. 654, 667 (1981).  But longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President.

As we stated in *Dakota Central Telephone Co.* v. *South Dakota ex rel. Payne*, 250 U. S. 163, 184 (1919), where a claim

> "concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.  This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion."

---

[6] As one commentator has observed, in cases in which the President concedes, either implicitly or explicitly, that the only source of his authority is statutory, no "constitutional question whatever" is raised. J. Choper, Judicial Review and the National Political Process 316 (1980). Rather, "the cases concern only issues of statutory interpretation." *Ibid.*

In a case analogous to the present one, *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103 (1948), an airline denied a certificate from the Civil Aeronautics Board to establish an international air route sought judicial review of the denial. Although the Civil Aeronautics Act, 49 U. S. C. § 646 (1946 ed.), generally allowed for judicial review of the Board's decisions, and did not explicitly exclude judicial review of decisions involving international routes of domestic airlines, we nonetheless held that review was unavailable. 333 U. S., at 114.

In reasoning pertinent to this case, we first held that the Board's certification was not reviewable because it was not final until approved by the President. See *id.*, at 112–114 ("[O]rders of the Board as to certificates for overseas or foreign air transportation are not mature and are therefore not susceptible of judicial review at any time before they are finalized by Presidential approval"). We then concluded that the President's decision to approve or disapprove the orders was not reviewable, because "the final orders embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate." See *id.*, at 114. We fully recognized that the consequence of our decision was to foreclose judicial review:

> "The dilemma faced by those who demand judicial review of the Board's order is that before Presidential approval it is not a final determination . . . and after Presidential approval the whole order, both in what is approved without change as well as in amendments which he directs, derives its vitality from the exercise of *unreviewable Presidential discretion*." *Id.*, at 113 (emphasis added).

Although the President's discretion in *Waterman S. S. Corp.* derived from the Constitution, we do not believe the result should be any different when the President's discretion derives from a valid statute. See *Dakota Central Telephone*

*Co., supra*, at 184; *United States* v. *George S. Bush & Co.*, 310 U. S. 371, 380 (1940).

The 1990 Act does not at all limit the President's discretion in approving or disapproving the Commission's recommendations. See § 2903(e); see also *Specter II*, 995 F. 2d, at 413 (Alito, J., dissenting). The Third Circuit seemed to believe that the President's authority to close bases depended on the Secretary's and Commission's compliance with statutory procedures. This view of the statute, however, incorrectly conflates the duties of the Secretary and Commission with the authority of the President. The President's authority to act is not contingent on the Secretary's and Commission's fulfillment of all the procedural requirements imposed upon them by the 1990 Act. Nothing in § 2903(e) requires the President to determine whether the Secretary or Commission committed any procedural violations in making their recommendations, nor does § 2903(e) prohibit the President from approving recommendations that are procedurally flawed. Indeed, nothing in § 2903(e) prevents the President from approving or disapproving the recommendations for whatever reason he sees fit. See § 2903(e); *Specter II*, 995 F. 2d, at 413 (Alito, J., dissenting).

How the President chooses to exercise the discretion Congress has granted him is not a matter for our review. See *Waterman S. S. Corp., supra; Dakota Central Telephone Co., supra*, at 184. As we stated in *George S. Bush & Co., supra*, at 380, "[n]o question of law is raised when the exercise of [the President's] discretion is challenged."

## III

In sum, we hold that the actions of the Secretary and the Commission cannot be reviewed under the APA because they are not "final agency actions." The actions of the President cannot be reviewed under the APA because the President is not an "agency" under that Act. The claim that the President exceeded his authority under the 1990 Act is not a con-

stitutional claim, but a statutory one. Where a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available.

Respondents tell us that failure to allow judicial review here would virtually repudiate *Marbury* v. *Madison*, 1 Cranch 137 (1803), and nearly two centuries of constitutional adjudication. But our conclusion that judicial review is not available for respondents' claim follows from our interpretation of an Act of Congress, by which we and all federal courts are bound. The judicial power of the United States conferred by Article III of the Constitution is upheld just as surely by withholding judicial relief where Congress has permissibly foreclosed it, as it is by granting such relief where authorized by the Constitution or by statute.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I did not join the majority opinion in *Franklin* v. *Massachusetts*, 505 U. S. 788 (1992), and would not extend that unfortunate holding to the facts of this case. I nevertheless agree that the Defense Base Closure and Realignment Act of 1990 "preclud[es] judicial review of a base-closing decision," *post*, at 484, and accordingly join JUSTICE SOUTER's opinion.

I write separately to underscore what I understand to be the limited reach of today's decision. The majority and concurring opinions conclude that the President acts within his unreviewable discretion in accepting or rejecting a recommended base-closing list, and that an aggrieved party may not enjoin closure of a duly selected base as a result of alleged error in the decisionmaking process. This conclusion, however, does not foreclose judicial review of a claim, for example, that the President added a base to the Defense

Base Closure and Realignment Commission's (Commission's) list in contravention of his statutory authority. Nor does either opinion suggest that judicial review would be unavailable for a timely claim seeking direct relief from a procedural violation, such as a suit claiming that a scheduled meeting of the Commission should be public, see § 2903(d), note following 10 U. S. C. § 2687 (1988 ed., Supp. IV), or that the Secretary of Defense should publish the proposed selection criteria and provide an opportunity for public comment, §§ 2903(b) and (c). Such a suit could be timely brought and adjudicated without interfering with Congress' intent to preclude judicial "cherry pick[ing]" or frustrating the statute's expedited decisionmaking schedule. See *post*, at 481. I also do not understand the majority's *Franklin* analysis to foreclose such a suit, since a decision to close the Commission's hearing, for example, would "'directly affect'" the rights of interested parties independent of any ultimate Presidential review. See *ante*, at 470; cf. *FCC* v. *ITT World Communications, Inc.*, 466 U. S. 463 (1984).

With the understanding that neither a challenge to ultra vires exercise of the President's statutory authority nor a timely procedural challenge is precluded, I join JUSTICE SOUTER's concurrence and Part II of the opinion of the Court.

JUSTICE SOUTER, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE GINSBURG join, concurring in part and concurring in the judgment.

I join Part II of the Court's opinion because I think it is clear that the President acted wholly within the discretion afforded him by the Defense Base Closure and Realignment Act of 1990 (Act), and because respondents pleaded no constitutional claim against the President, indeed, no claim against the President at all. As the Court explains, the Act grants the President unfettered discretion to accept the Commission's base-closing report or to reject it, for a good reason, a bad reason, or no reason. See *ante*, at 476.

It is not necessary to reach the question the Court answers in Part I, whether the Defense Base Closure and Realignment Commission's (Commission's) report is final agency action, because the text, structure, and purpose of the Act compel the conclusion that judicial review of the Commission's or the Secretary's compliance with it is precluded. There is, to be sure, a "strong presumption that Congress did not mean to prohibit all judicial review." *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 672 (1986) (internal quotation marks and citation omitted). But although no one feature of the Act, taken alone, is enough to overcome that strong presumption, I believe that the combination present in this unusual legislative scheme suffices.

In adopting the Act, Congress was intimately familiar with repeated, unsuccessful, efforts to close military bases in a rational and timely manner. See generally Defense Base Closure and Realignment Commission, Report to the President 1991.[1] That history of frustration is reflected in the Act's text and intricate structure, which plainly express congressional intent that action on a base-closing package be quick and final, or no action be taken at all.

At the heart of the distinctive statutory regime, Congress placed a series of tight and rigid deadlines on administrative review and Presidential action, embodied in provisions for three biennial rounds of base closings, in 1991, 1993, and 1995 (the "base-closing years"), §§ 2903(b) and (c), note following 10 U. S. C. § 2687 (1988 ed., Supp. IV), with unbending deadlines prescribed for each round. The Secretary is obliged to forward base-closing recommendations to the Commission,

---

[1] See also H. R. Conf. Rep. No. 101–923, p. 705 (1990) (Earlier base closures had "take[n] a considerable period of time and involve[d] numerous opportunities for challenges in court"); *id.*, at 707 (Act "would considerably enhance the ability of the Department of Defense . . . promptly [to] implement proposals for base closures and realignment"); H. R. Rep. No. 101–665, p. 384 (1990) ("Expedited procedures . . . are essential to make the base closure process work").

no later, respectively, than April 15, 1991, March 15, 1993, and March 15, 1995. § 2903(c). The Comptroller General must submit a report to Congress and the Commission evaluating the Secretary's recommendations by April 15 of each base-closing year. § 2903(d)(5). The Commission must then transmit a report to the President setting out its own recommendations by July 1 of each of those years. § 2903(d)(2). And in each such year, the President must, no later than July 15, either approve or disapprove the Commission's recommendations. § 2903(e)(1). If the President disapproves the Commission's report, the Commission must send the President a revised list of recommended base closings, no later than August 15. § 2903(e)(3). In that event, the President will have until September 1 to approve the Commission's revised report; if the President fails to approve the report by that date, then no bases will be closed that year. § 2903(e)(5). If, however, the President approves a Commission report within either of the times allowed, the report becomes effective unless Congress disapproves the President's decision by joint resolution (passed according to provisions for expedited and circumscribed internal procedures) within 45 days. §§ 2904(b)(1)(A), 2908.[2]

The Act requires that a decision about a base-closing package, once made, be implemented promptly. Once Congress has declined to disapprove the President's base-closing decision, the Secretary of Defense "shall . . . close all military installations recommended for closure." § 2904(a). The Secretary is given just two years after the President's transmittal to Congress to begin the complicated process of closing the listed bases and must complete each base-closing round within six years of the President's transmittal. See §§ 2904, 2905.

---

[2] To enable Congress to perform this prompt review, the Act requires the Secretary, the Comptroller General, and the Commission to provide Congress with information prior to the completion of Executive Branch review. See §§ 2903(a)(1), (b)(2), (c)(1), and (d)(3).

It is unlikely that Congress would have insisted on such a timetable for decision and implementation if the base-closing package would be subject to litigation during the periods allowed, in which case steps toward closing would either have to be delayed in deference to the litigation, or the litigation might be rendered moot by completion of the closing process. That unlikelihood is underscored by the provision for disbanding the Commission at the end of each base-closing decision round, and for terminating it automatically at the end of 1995, whether or not any bases have been selected to be closed. If Congress intended judicial review of individual base-closing decisions, it would be odd indeed to disband biennially, and at the end of three rounds to terminate, the only entity authorized to provide further review and recommendations.

The point that judicial review was probably not intended emerges again upon considering the linchpin of this unusual statutory scheme, which is its all-or-nothing feature. The President and Congress must accept or reject the biennial base-closing recommendations as a single package. See §§ 2903(e)(2), (e)(3), (e)(4) (as to the President); §§ 2908(a)(2) and (d)(2) (as to Congress). Neither the President nor Congress may add a base to the list or "cherry pick" one from it. This mandate for prompt acceptance or rejection of the entire package of base closings can only represent a considered allocation of authority between the Executive and Legislative Branches to enable each to reach important, but politically difficult, objectives. Indeed, the wisdom and ultimate political acceptability of a decision to close any one base depends on the other closure decisions joined with it in a given package, and the decisions made in the second and third rounds just as surely depend (or will depend) on the particular content of the package or packages of closings that will have preceded them. If judicial review could eliminate one base from a package, the political resolution embodied in that package would be destroyed; if such review could elimi-

nate an entire package, or leave its validity in doubt when a succeeding one had to be devised, the political resolution necessary to agree on the succeeding package would be rendered the more difficult, if not impossible. The very reasons that led Congress by this enactment to bind its hands from untying a package, once assembled, go far to persuade me that Congress did not mean the courts to have any such power through judicial review.

When combined with these strict timetables for decision, the temporary nature of the Commission, the requirement for prompt implementation, and the all-or-nothing base-closing requirement at the core of the Act, two secondary features of the legislation tend to reinforce my conclusion that judicial review was not intended. First, the Act provides nonjudicial opportunities to assess any procedural (or other) irregularities. The Commission and the Comptroller General review the Secretary's recommendations, see §§ 2903(d)(5), 2903(d)(3), and each can determine whether the Secretary has provided adequate information for reviewing the soundness of his recommendations.[3] The President may, of course, also take procedural irregularities into account in deciding whether to seek new recommendations from the Commission, or in deciding not to approve the Commission's recommendations altogether. And, ultimately, Congress may decide during its 45-day review period whether procedural failings call the Presidentially approved recommendations so far into question as to justify their substantive rejection.[4]

---

[3] Petitioners represent, indeed, that as to the round in question, the Comptroller General reported to Congress on procedural irregularities (as well as substantive differences of opinion) and requested additional information from the Secretary (which was provided). See Reply Brief for Petitioners 16, n. 12.

[4] In approving the base closings for 1991, Congress was apparently well aware of claims of procedural shortcomings, but nonetheless chose not to disapprove the list. See Department of Defense Appropriations Act, 1992, Pub. L. 102–172, § 8131, 105 Stat. 1208.

Second, the Act does make express provision for judicial review, but only of objections under the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, as amended, 42 U. S. C. § 4321 *et seq.,* to implementation plans for a base closing, and only after the process of selecting a package of bases for closure is complete. Because NEPA review during the base-closing decision process had stymied or delayed earlier efforts,[5] the Act, unlike prior legislation addressed to base closing, provides that NEPA has no application at all until after the President has submitted his decision to Congress and the process of selecting bases for closure has been completed. See § 2905(c)(1). NEPA then applies only to claims arising out of actual disposal or relocation of base property, not to the prior decision to choose one base or another for closing. § 2905(c)(2). The Act by its terms allows for "judicial review, with respect to any requirement of [NEPA]" made applicable to the Act by § 2905(c)(2), but requires the action to be initiated within 60 days of the Defense Department's act or omission as to the closing of a base. § 2905(c)(3). This express provision for judicial review of certain NEPA claims within a narrow time frame supports the conclusion that the Act precludes judicial review of other matters, not simply because the Act fails to provide expressly for such review, but because Congress surely would have prescribed similar time limits to preserve its considered schedules if review of other claims had been intended.

In sum, the text, structure, and purpose of the Act clearly manifest congressional intent to confine the base-closing selection process within a narrow time frame before inevitable political opposition to an individual base closing could become overwhelming, to ensure that the decisions be implemented promptly, and to limit acceptance or rejection to a package of base closings as a whole, for the sake of political feasibility. While no one aspect of the Act, standing alone,

---

[5] See, *e. g.,* H. R. Conf. Rep. No. 100–1071, p. 23 (1988).

would suffice to overcome the strong presumption in favor of judicial review, this structure (combined with the Act's provision for Executive and congressional review, and its requirement of time-constrained judicial review of implementation under NEPA) can be understood no other way than as precluding judicial review of a base-closing decision under the scheme that Congress, out of its doleful experience, chose to enact. I conclude accordingly that the Act forecloses such judicial review.

I thus join in Part II of the opinion of the Court, and in its judgment.