SLOVITER, Circuit Judge,
Dissenting.
If the issue before us were a dispute between individuals, or between companies, or between one or more individual and one or more company, I would join Judge Nygaard’s fine opinion for the majority without hesitation. But the issue *244 underlying the dispute between Governor Rendell and the Secretary of Defense is not confined to ordinary litigation. The seeds of the difference between the parties goes back to the very beginning of our existence as a nation, and it. must be understood in that context. I do not think it can or should be resolved by the expedient of declining to consider the merits under the rubric of mootness.
I.
History of the National Guard
The differences between the states and the federal government, generally viewed as between the Federalists and the Anti-Federalists, in the days before and after the ratification of the Constitution that pervaded many of its provisions extended as well to the manner in which the security of the new nation should be ensured. Historians note that the Articles of Confederation required the States to “always keep up a well regulated and disciplined militia[.]”[3] Whereas the Constitution gives Congress the power “[t]o raise and support Armies”[4] as well as the power “[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service or the United States,” the same clause “reserves to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the Authority of training the Militia according to the discipline prescribed by Congress[.]” The “Militia” referred to in the Constitution became, in time, the National Guard. Thus it is evident that even at the very inception of this country and despite the tensions between those favoring the national government and those favoring the States in the contests between them, there was general recognition of the role of the states over what was to become the National Guard.
The history of the National Guard is long and complex.[5] It has been detailed in the opinion of the Supreme Court in Perpich v. Department of Defense, 496 U.S. 334, 340, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990), and I refer only to certain details of relevance to the case before us. The earliest legislation, The Militia Act of 1792, contained provisions with respect to the state militias and required annual reporting by the State adjutant generals to the State governors and the President.[6] In 1901, after 111 ■ years of inactivity, Congress repealed The Militia Act and in 1903 it enacted The Dick Act,[7] which was designed to provide for a national reserve force to be provided by what had come to be called the National Guard. Significantly for our purpose, in the beginning there could be no provision of federal arms or joint maneuvers with the regulars unless and until the state governor requested such aid and support.[8]
*245 There were various amendments and recurring tensions between the states and federal government regarding funding and control over the National Guard, such as whether the infusion of federal funds entitled the federal government the right to call on the National Guard outside the United States (in the anticipated conflict with Mexico).[9] This persisted even after the enactment of The National Defense Act of 1916.[10]
As noted in the Perpich opinion, the 1916 statute provided that the Army of the United States was to include not only “the Regular Army” but also the National Guard while in the service of the United States. Perpich, 496 U.S. at 343 — 44, 110 S.Ct. 2418. The Court also noted that other issues were remedied by the 1933 amendments that created as “two overlapping but distinct organizations” the National Guard of the various states and the National Guard of the United States. Id. at 345, 110 S.Ct. 2418 (internal quotation marks omitted). What is now section 32 U.S.C. § 104(c) is the combined product of the National Defense Act of 1916 and the amendments enacted in 1933. Since the 1933 amendments there has been duál enlistment: any person enlisting in a State National Guard unit has simultaneously enlisted in the National Guard of the United States.[11] Perpich, 496 U.S. at 345, 110 S.Ct. 2418.
I leap forward because the history of the National Guard is of relevance to us only to the extent that it impacts on the majority’s decision not to consider the merits of the position of Governor Rendell that his statutory right to be consulted and give consent to the closure of the National Guard base (or unit) has been ignored.[12] A 1977 statute that dealt with the closing or realignment of military installations and its amendments was superceded by the 1988 statute that established the Commission on Base Realignment and Closure (“BRAC”).[13] It fell to the Secretary of Defense to implement the recommendations unless Congress disapproved. The Defense Base Closure and Realignment Act of 1990,[14] (the “BRAC Act”) was designed “to provide a fair process that will result in the timely closure and realignment of military installations inside the United States.”[15] That Act was further amended in 2005, giving the BRAC a significant role in reviewing the Secretary’s recommendations for closure and realign *246 ment of facilities.[16] Notably, however, nothing in the BRAC Acts and the predecessor statutes purported to amend or su-percede the provision of 32 U.S.C. § 104(c) that provides that “no change in the branch, organization, or allotment of a [National Guard] unit located entirely within a State may be made without the approval of its governor.” 32 U.S.C. § 104(c) (emphasis added).
Pursuant to the BRAC Act, the Secretary of Defense, after considering factors set forth in the statute,[17] is required to submit to the BRAC Commission a list of military installations within the United States that are recommended for closure or realignment. Pub.L. No. 107-107, 115 Stat. at 1346. The Act provides that “the Secretary shall consider any notice received from a local government in the vicinity of a military installation that the government would approve of the closure or realignment of the installation.”- Id.
“After receiving the recommendations from the Secretary pursuant to subsection (c) for any year, the Commission shall conduct public hearings on the recommendations.” Pub.L. No. 101-510, 104 Stat. at 1811. The BRAC Commission must thereafter transmit its report, “containing its findings and eonclusions[ ] based on a review and analysis of the Secretary’s recommendations” to the President. Pub.L. No. 107-107,115 Stat. at 1346. The President is then required to prepare a report containing his approval or disapproval of the Commission’s recommendations. Id. at 1347. If the President disapproves the Commission’s recommendations, the Commission may prepare a revised list of recommendations and transmit those to the President. Id. If the President disapproves the revised recommendations, the BRAC process for 2005 is terminated. Id. If the President approves either the original or revised recommendations, he must send the approved list and a certification of approval to Congress. Id. If Congress does not enact a resolution disapproving the approved recommendations within 45 days after receiving the President’s certification of approval, the Secretary must carry out all of the recommendations. Pub.L. No. 101-510,104 Stat. at 1812.
II.
The Present Action
The action before us was filed by Edward G. Rendell, Governor of the Commonwealth of Pennsylvania, and Pennsylvania’s two senators, Arlen Specter, and Rick Santorum, challenging the legality of the recommendation made by the then Secretary of Defense Rumsfeld to the BRAC Commission (the “BRAC DoD Report”). The essence of the lawsuit is described in the excellent detailed opinion of District Judge John Padova of the Eastern District of Pennsylvania. Because Judge Padova’s opinion is not reported in the West Reporter system and is available only on online services, I quote from it in more detail than would be usual. Judge Padova explained:
In the BRAC DoD Report, Secretary Rumsfeld recommended that the Naval Air Station Joint Reserve Base Willow Grove, Pennsylvania, be closed. In connection with this closure, he recoin- *247 mended that “all Navy and Marine Corps squadrons, their aircraft and necessary personnel, equipment and support” be relocated to McGuire Air Force Base, Cookstown, New Jersey. He further recommended that the Pennsylvania Air National Guard’s 111th Fighter Wing, which is stationed at the Willow Grove Naval Air Station, be deactivated and that half of its assigned A-10 aircraft be relocated to different Air National Guard units in Idaho, Maryland and Michigan, while the remainder of the aircraft be retired.
The 111th Fighter Wing is an operational flying National Guard unit located entirely within the Commonwealth of Pennsylvania with 1023 military positions. Deactivation of the 111th Fighter Wing would deprive the Governor of nearly 1 /4th the total strength of the Pennsylvania Air National Guard and would deprive the Governor and Commonwealth of a key unit with the current capability of addressing homeland security missions in Southeastern Pennsylvania. Deactivation of the 111th Fighter Wing would be the ultimate change in the branch, organization or allotment of the unit. In May 2005, and at all times subsequent to Secretary Rumsfeld’s transmittal of the BRAC DoD Report to the Defense Base Closure and Realignment Commission (the “BRAC Commission”), “the overwhelming majority of the 111th Fighter Wing was not and currently is not in active federal service.”
Neither Secretary Rumsfeld nor any authorized representative of the Department of Defense requested Governor Rendell’s approval to change the branch, organization, or allotment of the 111th Fighter Wing, or requested Governor Rendell’s consent to relocate or -withdraw the 111th Fighter Wing during the 2005 BRAC process. Governor Rendell sent a letter to Secretary Rumsfeld on May 26, 2005, officially advising the Secretary that he did not consent to the deactivation, relocation or withdrawal of the 111th Fighter Wing. Deputy Assistant Secretary of the Air Force Gerald F. Pease, Jr. replied to the Governor’s letter on July 11, 2005, but did not address the Secretary’s failure to obtain the Governor’s prior consent to the recommendation that the 111th Fighter Wing be deactivated.
2005 WL 2050295, at *1-2 (E.D.Pa. Aug.26, 2005) (footnote omitted) (internal citations omitted).
The District Court considered and rejected the arguments by the Secretary in support of dismissal of the complaint. In response to the Secretary’s argument that Governor Rendell did not have standing because he had not suffered an imminent injury that is concrete, the District Court stated:
In this case, assuming that the Governor is correct about the merits of his claim, he had the statutory right to disapprove changes to the branch, organization or allotment of a unit of the National Guard located wholly within the Commonwealth, and his disapproval would have been sufficient to prevent the deactivation recommendation from going to the BRAC Commission. His right to prior approval or disapproval has, however, been completely nullified by the Secretary’s recommendation. We find that the injury suffered by the Governor is the type of concrete and particularized injury contemplated by Coleman [v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) ]. We further find that this injury is, in fact, traceable to the Secretary’s recommendation to deactivate the 111th Fighter Wing and that this injury may be redressed by the ■requested relief, ie., an order declaring *248 that Secretary Rumsfeld has violated federal law by designating the 111th Fighter Wing for deactivation without first obtaining the approval of Governor Rendell and an order declaring that the portion of the BRAC DoD Report that recommends deactivation of the 111th Fighter Wing is null and void. Accordingly, we find that Governor Rendell has standing to assert the claims alleged in the Complaint.
Id. at *9 (internal citations omitted).
In response to the Secretary’s assertion that the claims asserted in the complaint are not ripe, the District Court analyzed the three factors relevant to a ripeness determination: the adversity of the parties’ interest, the conclusiveness of the judgment, and the utility of the judgment. Id. at *10. As to adversity, the Court stated that “Governor Rendell suffered an injury in fact with respect to the derogation of his statutory power to consent to or to disapprove changes to the branch, organization or allotment of a unit of the National Guard located wholly within the Commonwealth,” id., and found that the adversity prong is satisfied. With respect to the conclusiveness inquiry, the District Court stated:
No party disputes that the 111th Fighter Wing is a unit of the Pennsylvania Air National Guard; that it is presently under state control; that the Secretary recommended deactivation of the 111th Fighter Wing in his Report to the BRAC Commission; and that he did not seek or obtain Governor Rendell’s prior approval to do so. The claims asserted in the Complaint present solely legal issues, obviating the need for future factual development. A declaratory judgment would conclusively determine whether the Secretary of Defense can legally recommend deactivating the 111th Fighter Wing without Governor Rendell’s prior approval. We find, accordingly, that the conclusiveness prong is satisfied in this case.

Id.

Finally, the Court turned to the utility inquiry and concluded:
The utility inquiry focuses on the hardship to the parties of withholding decision and whether the claim involves uncertain and contingent events. In determining utility, the Court examines “whether the parties” plans of actions are likely to be affected by a declaratory judgment. Governor Rendell is the commander-in-chief of the Pennsylvania National Guard, including 111th Fighter Wing. 51 Pa. Cons.Stat. Ann. § 501. As commander-in-chief, the Governor has the power to accept allotments of military personnel and equipment from the Department of Defense for the Pennsylvania National Guard; carry out training of the Pennsylvania National Guard; establish the location of any assigned, authorized units of the Pennsylvania National Guard; organize or reorganize any organization or unit of the Pennsylvania National Guard; and place the Pennsylvania National Guard on active duty during an emergency in this Commonwealth. 51 Pa. Cons.Stat. Ann. §§ 502-505, 508. A declaratory judgment determining the legality of the Secretary’s recommendation to deactivate the 111th Fighter Wing — a unit that constitutes 1/4 of the personnel of the Pennsylvania Air National Guard — clearly would effect the Governor’s ability to carry out his powers as commander-in-chief, particularly his ability to call members of the 111th Fighter Wing to active duty in the case of an emergency in this Commonwealth. We find, therefore, that *249 the utility prong is satisfied in this case.
Id. at * 11.
Having rejected the Secretary’s motion to dismiss on the grounds referred to above, the District Court then considered the application of Dalton v. Specter, 511 U.S. 462, 466, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), where the Supreme Court rejected a challenge to the President’s decision, pursuant to the 1990 BRAC Act, to close the Philadelphia Naval Shipyard. The District Court held that Dalton did not bar Governor Rendell’s action because, unlike the complaint in Dalton, the complaint by Governor Rendell was not brought pursuant to the Administrative Procedure Act. Rendell v. Rumsfeld, 2005 WL 2050295, at * 11. The District Court then turned to the concurring opinion in Dalton written by Justice Souter which essentially concluded that “the text, structure, and purpose of the Act” manifest that the Act forecloses judicial review. Id. at *13; Dalton, 511 U.S. at 479, 114 S.Ct. 1719. The District Court differentiated the issue in Dalton from that before it, stating:
The Secretary’s recommendation to close the Willow Grove Naval Air Station has not been challenged in this lawsuit. Wdiat has been challenged' is the legality of his further recommendation that the 111th Fighter Wing be deactivated. The parties have pointed to nothing in the express language, structure, objectives, or legislative history of the laws pursuant to which this case has been brought that prohibits judicial review. Accordingly, we find that the structure, objectives, and legislative history of the BRAC Act do not prohibit judicial review of the legality of the Secretary’s recommendation to deactivate the 111th Fighter Wing.
Rendell v. Rumsfeld, 2005 WL 2050295, at * 14. After considering the merits of the complaint on the opposing motions for summary judgment, the District Court granted the Commonwealth’s motion for declaratory judgment and held as follows:
a. Secretary Rumsfeld, by designating [for deactivation] the 111th Fighter Wing of the Pennsylvania Air National Guard without first obtaining the approval of Governor Rendell, has violated 32 U.S.C. § 104(c).
b. The portion of the BRAC DoD Report that recommends deactivation of the 111th Fighter Wing of the Pennsylvania Air National Guard is null and void.
Id. at *21-22.
There are many issues decided by the District Court that merit appellate review. Unfortunately, the majority opinion does not discuss them. Instead, it has chosen to grant the Secretary’s motion to dismiss this appeal on the basis of mootness. The majority holds that because the Commission voted to strike from the Secretary’s recommendation the deactivation of the 111th Fighter Wing (Air National Guard) and the relocation of the assigned aircraft elsewhere, which recommendation was approved by the President without rejection by Congress, thereby becoming law, the case is now moot. The majority states that in light of those events, the District Court’s declaration that the “portion of the [Secretary’s] report that recommends deactivation of the 111th Fighter Wing of the Pennsylvania Air National Guard is null and void” is “wholly unnecessary.” Maj. Op. at 241.
The majority recognizes that one of the principal exceptions to the mootness doctrine is the one covering the situation when the issue is “capable of repetition, yet evading review.” The majority holds that exception is inapplicable here because *250 “there is no reasonable likelihood that the alleged harm will occur again.” Maj. Op. at 241. The majority reasons that the harm was that of the Secretary’s recommendation with respect to base closings, a harm that cannot recur unless Congress were to pass another statute calling for a new round of base closures with procedures similar to those in the statute leading to the Secretary’s recommendation to deactivate the 111th Fighter Wing. I am not as sanguine as the majority that there will be no decision in the near future to reconsider where military bases should be placed or replaced in light of the uncertain world situation and the deployment of National Guard Units to combat zones.[18]
III.
The Issue on Appeal
In response to the Secretary’s argument that the matter before us is moot, Governor Rendell argues that by including in the recommendation to the BRAC Commission the removal of all of the 111th Fighter Wing’s aircraft, a recommendation that was untouched when the BRAC Commission forwarded the recommendation to the President, the result would be the constructive deactivation of the 111th Fighter Wing. Therefore, argues the Governor, the matter is not moot because if the 111th aircraft were taken without replacing the allotted planes, the unit would be made inactive and ineffective.
I, for one, have had some difficulty understanding the Governor’s position on this appeal with respect to the aircraft. On one hand, the Governor appears to have disclaimed any challenge to the movement of the aircraft or to the actions of the Commission on this appeal. When questioned about that at oral argument the Governor’s counsel stated that the effect of the removal of the aircraft would be that the “mission” of the 111th Fighter Wing would be taken away. Tr. at 22-23. Counsel later stated “[w]e’re challenging not the taking away of these particular planes but the taking away of planes for all time. We’re taking away their ability to fly, if you can understand it that way[.]” Tr. at 24. Counsel for the Governor stated that the final documents signed by the President contained, inter alia, the recommendation to “[distribute the 15 A-10 aircraft assigned to [the] 111th Fighter Wing. And it goes on to say that they [would] be distributed to various other locations, Boise Air Terminal Air Guard Station, Martin State Airport Air Guard Station, and so on.” Tr. at 24-25. I find it difficult to reconcile that argument with the Governor’s failure to raise the distribution of the aircraft in the District Court.
However, I look at the issue in this case as a broader one than that identified by the majority. I understand Governor Rendell to have challenged the Secretary’s action because the Secretary failed to follow the requirement of 32 U.S.C. § 104(c) to seek and await the Governor’s approval to any “change in the branch, organization, or allotment of a [National Guard] unit *251 located entirely within [the Commonwealth.]” That challenge is made clear and patent in the Governor’s brief on appeal and in the oral argument made by the Governor’s counsel. Counsel for the Secretary parried our inquiry. He argued, alternately, that the Governor’s challenge was initially made at a time when it was not ripe, as all the Secretary had done was make a recommendation to the Commission. He later argued that a challenge made after the President approved the Commission’s recommendation and sent it to Congress could not be heard under the precedent of Dalton v. Specter, 511 U.S. 462, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). Finally, in response to this court’s persistent questions on that issue, counsel for the Secretary finally conceded that “we believe, that there is no judicial review.” Tr. at 40.
I dissent from the majority’s decision because it evades deciding whether § 104(c) retains any effect. The District Court held that the Governor’s right to prior approval or disapproval has been “completely nullified by the Secretary’s recommendation.” Rendell v. Rumsfeld, 2005 WL 2050295, at *9. The Secretary argues that “[ajdding a gubernatorial consent requirement (drawn from § 104(c)) would interfere with the Base Closure Act[.]” Govt’s Br. at 29-30. The Governor responds that the Base Closure Act expressly superseded some federal statutes relating to base closings, but contains no such provision with respect to the gubernatorial consent statutes.
I have reached no decision with respect to the conflicting arguments but it is a significant issue, one between the rights of the states and the federal government harkening back to the very foundation of our government. Concededly, the Governor’s obligation to provide for the civil defense of the people and property of Pennsylvania in this era of threats to the homeland may require calling on the National Guard. I dissent from the majority’s choice not to consider the merits of this issue. To paraphrase Rabbi Hillel, “if not now, when?”

. John K. Mahon, History of the Militia and the National Guard 46 (Louis Morton ed., 1983) (quoting Article of Confederation VI).

. U.S. Const, art. I, § 8.

. See, e.g., Mahon, supra note 1; Jerry Cooper, The Rise of the National Guard, The Evolution of the American Militia, 1865-1920 (1997).

. 'The history of the militias is discussed in a student comment, and' casenote, Jason A. Coats, Base Closure and Realignment: Federal Control Over the National Guard, 75 U. Cin. L.Rev. 343, 347 (2006), which takes its historical material primarily from two more objective sources, the treatises by Mahon, supra note 1, and Cooper, supra note 3.

. So named for Major General Charles Dick. Mahon, supra note 1, at 139.

. Id.

. See Cooper, supra note 3, at 114-15.

. Cooper describes the conflict as follows: “From the Spanish-American War through 1915, Guardsmen sought increased federal financial aid, statutory recognition as the nation's first-line reserve, and retention of their central role in manpower policy. At the same time, they defended long-established rights to select officers and organize units as they saw fit and asserted a right to make military policy when it affected the state soldiery.” Id. at 153.

. The holding in Perpich that "Congress may authorize the President to order members of the National Guard to active duty for purposes of training outside the United States during peacetime without either the consent of a State Governor or the denomination of a national emergency,” 496 U.S. at 336, 110 S.Ct. 2418, is not at issue here.

. Military Construction Authorization Act, 1978, Pub.L. No. 94-431, 90 Stat. 1349 (1977).

. Defense Authorization Amendments and Base Closure and Realignment Act, Pub.L. No. 100-526, 102 Stat. 2623 (codified as amended at 10 U.S.C. § 2687 (1998 & Supp. 2006)).

. Defense Base Closure and Realignment Act of 1990, Pub.L. No. 101-510, §§ 2901-11, 104 Stat. 1808 (portions codified at 10 U.S.C. § 2687 note (1998)).

. Id., 104 Stat. at 1808.

. National Defense Authorization Act for Fiscal Year 2002, Pub.L. No. 107-107, §§ 3001-3006, 115 Stat. 1012, 1342-51 (2001) (codified at 10 U.S.C. § 2687 note (Supp.2006)).

. The Act provides that the final selection criteria "to be used by the Secretary in making recommendations for the closure or realignment of military installations inside the United States ... shall be the military value and other criteria specified in subsections (b) and (c)."

. Moreover, I note that Governor Rendell's affidavit states that the Department of the Navy has issued two Notices of Availability of Navy Real Property, one on November 15, 2005 and the other on January 17, 2006, which included all of the real property at Willow Grove as available for acquisition by the other federal agencies. Despite the BRAC requirement that an enclave be established for the 111th sufficient to support flight operations, the second Notice stated that if there was no interest by a federal agency, the property would be available for private development. The Department of the Navy also notified the Governor's staff that, notwithstanding the enclave requirement, the Navy believed that there was no need to keep the airfield because the A-10 aircraft assigned to the 111th would be taken away. See Rendell Aff. ¶¶ 3-7.