**MIAMI BUILDING & CONSTRUC- TION TRADES COUNCIL, et al., Plaintiffs,**

v.

**SECRETARY OF DEFENSE, et al., Defendants.**

**Miami–Dade County, Plaintiff,**

v.

**Secretary of Defense, et al., Defendants.**

Nos. CIV.A. 01–0067(PLF), CIV.A. 01–0556(PLF).

United States District Court, District of Columbia.

May 9, 2001.

**20**

Lawrence E. Levinson, pro hac vice, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, DC, Ignacio E. Sanchez, pro hac vice, Verner, Liipfert, Bernhard, McPherson & Hand, Miami, FL, for Miami Bldg. & Const. Trades Council, AFL/CIO, plaintiff.

Lawrence E. Levinson, pro hac vice, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, DC, Ignacio E. Sanchez, pro hac vice, Verner, Liipfert, Bernhard, McPherson & Hand, Miami, FL, Steven R. Reininger, pro hac vice, Raco, Reininger & Perez P.A., Coral Gables, FL, for Homestead air Base Developers, Inc., plaintiff.

T. Neal McAliley, U.S. Department of Justice, Environment & Natural Resources Division, Miami, FL, for defendants.

*OPINION*

PAUL L. FRIEDMAN, District Justice.

This matter is before the Court on the motion for preliminary injunction filed by plaintiffs Miami Building & Construction Trades Council, AFL/CIO, and Homestead Air Base Developers, Inc. ("HABDI plaintiffs") and on the motion for preliminary injunction filed by plaintiff Miami–Dade County. On May 3, 2001, the parties appeared before the Court for oral argument on the motions. Upon consideration of the briefs and supporting documentation filed by the parties and the oral arguments of counsel, the Court denies the motions for preliminary injunction.

## I. FACTUAL BACKGROUND

The dispute in the this case revolves around the disposal of surplus military property that was once part of Homestead Air Force Base. The base is located ap-

proximately 25 miles south of downtown Miami, two miles west of Biscayne National Park, and eight miles east of Everglades National Park and originally encompassed about 2900 acres. The base was in heavy use by the Air Force for many years until 1992 when Hurricane Andrew destroyed most of its facilities.

In early 1993, under the Defense Base Closure and Realignment Act of 1990, ("DBCRA of 1990"), Pub.L. 101–510, 104 Stat. 1808, the Secretary of Defense proposed that the base be closed completely. The Defense Base Closure and Realignment Commission recommended that 885 acres of the original base be realigned to support the operations of the Air Force Reserve, the Florida Air National Guard and the U.S. Customs Service. In March 1994, the portion of the base retained for these operations was renamed Homestead Air Reserve Station.

In July and December of 1993, the Homestead Air Force Base Reuse Committee submitted a plan proposing that the surplus property on the base be converted into a commercial airport. Under the plan, reserve operations would continue on part of the base and the Air Force would convey much of the surplus property to the County for the construction and operation of a commercial airport. As required by the National Environmental Policy Act ("NEPA"), the Air Force prepared an environmental impact statement ("EIS"), issuing a draft in November 1993 and a final EIS in February 1994. *See* Federal Defendants' Consolidated Opposition to Plaintiffs' Motions for Preliminary Injunction ("Defendants' Opp."), Exhibit 2, Final Environmental Impact Statement, February 1994 ("Final EIS"). With respect to the surplus property that the County would receive, the Final EIS considered the impacts of four alternatives: The first was the Reuse Committee's plan for a commer-

cial airport with some non-aviation uses; the second and third alternatives combined plans for a commercial airport with various non-aviation uses; and the fourth was a "no-action" plan.

In October 1994, the Air Force issued a Record of Decision making the property available to the County for redevelopment as a commercial airport. *See* Defendants' Opp., Exhibit 3, Record of Decision on the Disposal of Homestead Air Force Base, October 26, 1994 ("1994 ROD"). Based on the Air Force's consideration of the Final EIS, the 1994 ROD gave the County the right to apply for the property as an airport subject to the Air Force's final approval of the County's plans. *See id.* at 13, ¶ 1. The 1994 ROD provided for alternatives for disposal of the property if the airport plans never materialized or if the Air Force rejected the County's plan. The 1994 ROD also made conveyances to other federal, state and local entities not challenged in these suits.

The County began planning for the construction and operation of the commercial airport. Instead of applying for the property immediately, however, it entered into a series of interim leases with the Air Force. The interim leases, each of which was for a term of six to twelve months, provided that the lease itself was not "a commitment by the Government as to the disposal of the Leased Premises or of Homestead AFB, in whole or in part, to the Lessee or any agency or instrumentality thereof...." HABDI's Plaintiffs' First Motion for Preliminary Injunction, Civil Action No. 01–0067, January 12, 2001, Affidavit of Carlos Herrera, Jr., Exhibit 6, Department of Air Force Lease of Property on Air Force Base at 9. During the period of the interim lease, in June 1996, the County entered into a Lease and Development Agreement with Homestead Air Base Developers, Inc. ("HABDI") in

which, among other things, the County agreed that it would lease the property to HABDI, that HABDI would build and operate the airport, and that the County would receive a portion of the revenues. The Lease and Development Agreement was conditioned upon the County receiving a 30 year lease or a fee simple conveyance of the property from the Air Force.

On December 31, 1996, the County applied to the Air Force for the surplus property at Homestead. Prior to the submission of the County's application, environmental groups raised concerns with the Air Force that the Final EIS inadequately addressed the environmental impacts associated with the airport, partly because of changed circumstances. Subsequently, in light of these alleged deficiencies, the Air Force and the Federal Aviation Administration conducted a review of the Final EIS revealing that there indeed were new circumstances: (1) the County's application predicted commercial jet operations at twice the level that was originally envisioned, and (2) the proposed airport's ground facilities were much more extensive than first proposed. In December 1997, the Air Force and the FAA announced that they would supplement the Final EIS.

In December 1999, after conducting public meetings and receiving comments from interested parties, the Air Force and the FAA issued a draft supplement to the Final EIS, and on December 7, 2000, they issued the Final Supplemental Environment Impact Statement ("SEIS"). See Defendants' Opp., Exhibit 1, SEIS. The SEIS considered four alternatives: (1) development of a commercial airport along the lines of the original proposal, (2) development of a spaceport, (3) mixed-use development involving commercial, industrial and/or residential uses but without a commercial airport, and (4) a "no action" alternative. The SEIS analyzed four scenarios for mixed-use development: (1) a land-swap proposal submitted by the Collier Resource Company, (2) a proposal submitted by Hoover Environmental Group, (3) a combination of the Collier and Hoover plans, and (4) a market-based scenario.

In the SEIS, the Air Force concluded that both the commercial airport and the mixed-use development plan would generate economic benefits for the region and expressed a preference for either alternative. The FAA preferred the commercial airport. The Department of the Interior favored the mixed-use plan for development of the base, specifically the land-swap proposal submitted by Collier. The EPA also favored the mixed-use plan. On December 14, 2000, Interior sent a letter to the Air Force asking that the property be transferred to Interior so it could act on the Collier land-swap plan. The County objected to this request.

On January 15, 2001, the Air Force issued a Second Supplemental ROD deciding that the property could be transferred only for mixed-use development and not as a commercial airport. See Defendants' Opp., Exhibit 17, Second Supplemental Record of Decision, January 15, 2001 ("2001 ROD").[1] The 2001 ROD explained that the property first would be offered to the County which had 90 days to decide whether it wished to apply for the property for mixed–use development. If the County decided to apply for the property, it would have six months to complete its application. If the County decided not to apply or if the Air Force rejected the

---

1. The First Supplemental ROD was issued on February 20, 1998 and involved the transfer of land to Interior which then transferred the land to the County for a public park. Plaintiffs do not challenge this decision.

County's proposal, defendants would consider transferring the property to Interior to act on the Collier proposal. If the land was not disposed of under either of these two options, the property would be disposed of through public sale.

## II. PROCEDURAL POSTURE

On January 12, 2001, the HABDI plaintiffs filed Civil Action No. 01–0067. When defendants issued the 2001 ROD, the HABDI plaintiffs' complaint and first motion for preliminary injunction were rendered moot. On March 8, 2001, the HABDI plaintiffs filed their first verified amended complaint contending that: (1) the Air Force violated the DBCRA laws and the Administrative Procedure Act by deciding to prepare and issue the SEIS, (2) the Air Force violated the DBCRA and the APA when it issued the 2001 ROD, (3) the Air Force violated the DBCRA and the APA when it considered the late request by Interior for the land, (4) the Air Force violated the DBCRA and the APA when it failed to transfer the land to the County pursuant to the 1994 ROD, and (5) the Air Force violated the Fifth Amendment of the Constitution by denying plaintiffs their equal protection and due process rights.

On March 12, 2001, plaintiff Miami–Dade County filed Civil Action No. 01–0556. In Count 1, the County claimed that the request by Interior for the surplus land was unlawful under Section 2904 of the Defense Base Closure and Realignment Act of 1993, ("DBCRA of 1993"). Count 2 claimed that the SEIS and the 2001 ROD violated Section 2911 of the DBCRA of 1993. Count 3 claimed that the issuance of the 2001 ROD and the decision made by the Air Force in the 2001 ROD were arbitrary and capricious. On March 16, 2001, the County gave notice to the Air Force that while continuing with this lawsuit, it also would develop plans for mixed-use development and apply for the property under the terms of the 2001 ROD. The County's decision triggered the running of the six-month time period for preparing the mixed-use plan. Prior to the motions hearing, defendants agreed to a short, 30 day stay running from April 10, 2001 to May 10, 2001 that will not count against the County's six months.

On April 4, 2001, the Court issued an order (1) denying defendants' motion to transfer both cases to the United States District Court for the Southern District of Florida, and (2) consolidating the two cases. On April 24, 2001, the Court granted the motion of the Natural Resources Defense Council, Sierra Club, and Tropical Audubon Society for permissive intervention on the side of defendants under Rule 24(a)(2) of the Federal Rules of Civil Procedure. The Court held a motions hearing on May 3, 2001 at which all parties to the litigation in both matters participated.

## III. DISCUSSION

### A. *Standards for Preliminary Injunction*

■ In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claims, (2) whether plaintiffs will suffer irreparable injury absent an injunction, (3) the harm to defendants or other interested parties (balance of harms), and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. *See Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C.Cir.1998); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C.Cir.1989); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977); *Milk Industry Foundation v.*

*Glickman,* 949 F.Supp. 882, 888 (D.D.C. 1996).

■ Plaintiffs are not required to prevail on each of these factors. Rather, under *Holiday Tours,* the factors must be viewed as a continuum, with more of one factor compensating for less of another. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id. See Serono Laboratories, Inc. v. Shalala,* 158 F.3d at 1318. Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d at 843–45. In sum, an injunction may be issued "with either a high probability of success and some injury, or vice versa." *Cuomo v. United States Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C.Cir. 1985).

*B. Likelihood of Success on the Merits*

1. The Supplemental Environmental Impact Statement

Both the HABDI plaintiffs and the County challenge the decision of the Air Force to supplement the Final EIS. Based on their reading of Section 2911 of the DBCRA of 1993, Pub.L. 103–160, § 2911, 107 Stat.1909, 1924, plaintiffs contend that the decision in December 1997 to prepare the SEIS was untimely. Defendants re-

spond that plaintiffs' challenge to the decision to prepare the SEIS should fail because (1) plaintiffs' challenge is barred by the statute of limitations, (2) plaintiffs' challenge is moot, and (3) defendants properly made the decision to supplement the Final EIS. Without reaching the second argument, the Court concludes, based on the first and third arguments, that plaintiffs have failed to demonstrate a likelihood of success on the merits.

a. Statute of Limitations

■ Defendants contend that plaintiffs' challenge to the SEIS is barred by the statute of limitations. Defendants cite Section 2905(c)(3) of the DBCRA of 1990 which requires that suits seeking judicial review of actions taken by the Air Force pursuant to its obligations under NEPA must be made within 60 days of the challenged action. *See* Pub.L. 101–510, 104 Stat. at 1815. Here, the action plaintiffs ask the Court to review is the decision of the Air Force to prepare the SEIS but not the substance of the SEIS itself. Defendants therefore argue that the 60–day limitations period began to run in December 1997 when the Air Force made this decision. They maintain that because plaintiffs did not seek judicial review at that time and waited for over three years to do so, the statute of limitations has long since run, making this challenge untimely.

Plaintiffs respond that the 60–day limitations period did not start to run in December 1997 because they challenge the entire course of allegedly illegal decisions made by the Air Force. The Court rejects this argument. While it is true that plaintiffs are challenging all of the actions taken by the Air Force in relation to the SEIS and the 2001 ROD, with respect to the SEIS plaintiffs only challenge the decision to prepare the SEIS. Thus, the 60–day limitations period began running in De-

cember 1997 when the decision to prepare the SEIS was made.[2] Because the challenge to the SEIS appears to be barred by the statute of limitations, plaintiffs have failed to demonstrate a likelihood of success on the merits on this claim.

### b. Timeliness of the SEIS

■ Even if the challenge to the SEIS is not time-barred, plaintiffs have not shown a likelihood of success on their claim that the SEIS was untimely. Plaintiffs rely on Section 2911 of the DBCRA of 1993, which provides:

> Not later than 12 months after the date of the submittal to the Secretary of Defense of a redevelopment plan for an installation approved for closure under a base closure law, the Secretary of Defense shall, to the extent practicable, complete any environmental impact analyses required with respect to the installation, and with respect to the redevelopment plan, if any, for the installation, pursuant to the base closure law under which the installation is closed, and pursuant to [NEPA].

Pub.L. 103–160, § 2911, 107 Stat.1909, 1924. Plaintiffs interpret this provision as an absolute requirement that all procedures that defendants have to follow under NEPA must be completed within 12 months. In addition to the language of the statute, plaintiffs rely on Justice Souter's concurring opinion in *Dalton v. Specter*, 511 U.S. 462, 478–84, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (Souter, J., concurring), as support for their argument that the intent of Congress and the structure of the base closure laws demonstrate that the

timetables in the base closure laws are "tight and rigid deadlines" and that the preparation of the SEIS violated this law because it occurred well beyond the 12–month period.

Based on its reading of the text of Section 2911, the Court rejects plaintiffs' argument. Section 2911 contains the phrase "to the extent practicable," suggesting that there is some discretion and flexibility given to the Air Force to complete the EIS as required by NEPA. *See Fund for Animals v. Babbitt*, 903 F.Supp. 96, 107 (D.D.C. 1995). Although plaintiffs believe otherwise, the Court concludes that the best reading of Section 2911 is that the phrase "to the extent practicable" modifies the time in which the EIS must be prepared and does not modify or eliminate the Air Force's responsibilities under NEPA. Here, it was not practicable—that is, feasible or possible—to comply with all the requirements of NEPA within 12 months from the date the redevelopment plan had been submitted to the Air Force. Information had surfaced that did not exist when the Final EIS was completed in February 1994—namely, (1) the scope of commercial jet operations out of the airport, (2) new options for the land (mixed-use development), (3) new laws reflecting the importance of protecting the Everglades, and (4) previously unknown environmental impacts. Thus, compliance with NEPA within the 12 month time frame was not "practicable." In fact, the Air Force was probably required under NEPA to prepare the SEIS in light of these changed circum-

---

**2.** In support of their position and in response to the defendants' arguments, plaintiffs argue that the 60–day statute of limitations should apply to defendants' decision to reopen the NEPA process and prepare the SEIS at the urging of environmental groups in the area. This argument overlooks the fact Section 2905(c)(3) of the DBCRA of 1990 only applies to suits challenging actions taken under NEPA. *See* Pub.L. 101–510, 104 Stat. at 1815. Here, there is no suggestion that the SEIS was conducted in response to a lawsuit but rather because these environmental groups apprised the Air Force of changed circumstances.

stances whenever they came to light. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 370–74, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *see also* 40 C.F.R. § 1502.9(c)(1)(ii) & (2).

The Court also does not agree with the plaintiffs' reading of Justice Souter's concurring opinion in *Dalton v. Specter.* Justice Souter's analysis focused on the timetables provided in the base closure laws with respect to the decision to close or realign military bases and not to the decision about how to dispose of the surplus property at closed or realigned bases after closure. *See Dalton v. Specter,* 511 U.S. at 479–82, 114 S.Ct. 1719. Here, the initial decision to close Homestead Air Force Base had already been made when the SEIS was authorized and prepared. All that remains is the disposal of the property for use by the County, a decision that implicates the requirements of NEPA and not the "tight and rigid" enforcement of deadlines discussed in *Dalton.*[3] On the challenge to the decision to prepare the SEIS, the Court concludes that plaintiffs have not demonstrated a likelihood of success on the merits.

### 2. Claims Relating to the 2001 ROD

■ Plaintiffs also challenge the 2001 ROD itself and allege that the decision to designate the land for mixed-use development was unsupported by any evidence in the record. They contend that the decision reflected in the 2001 ROD was arbitrary and capricious because all of the information examined when issuing the 2001 ROD was information that was known when the 1994 ROD was issued; thus the change from the airport to mixed-use development cannot be supported.

■ The standard for the Court's review of agency action requires deference to the reasonable decision of the agency in light of its expertise in the field. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Moreover, the question before the Court is not whether other options, such as building a commercial airport on a smaller scale, could have been adopted by the Air Force, but whether its actual decision was a rational one. *See id.* at 43, 103 S.Ct. 2856. Finally, an agency may change a past decision so long as there are reasons for the change and those reasons are rationally related to the agency's new decision. *See id.* at 42–43, 103 S.Ct. 2856. With these principles in mind and based on the record before it, the Court concludes that plaintiffs have failed to demonstrate a likelihood of success on this claim.

As noted previously, defendants and intervenors offer several changed circumstances to support the Air Force's new decision—most significantly, the increased scope of commercial jet operations out of the proposed airport and newly recognized environmental impacts. In addition, defendants contend that the decision to prohibit an airport is supported by the fact that for the first time the Air Force could consider an option other than economic development through construction of the airport or no development at all. In the 2001 ROD, the Air Force was able to weigh an additional choice—mixed-use development—which it felt best balanced the goals of economic development and environmental protection. Because it appears that the Air Force acted within the proper scope of its discretion, and because the Air

---

**3.** Plaintiffs' third argument—that the Air Force was excused from complying with the NEPA requirements because compliance is inconsistent with the statutory requirements and time limitations of the DBCRA laws—is really a related argument which fails for the same reasons.

Force appears to have provided a reasoned explanation for its change of view based on changed circumstances, plaintiffs cannot show a likelihood of success on the merits.

■ Plaintiffs make a related argument concerning the late request by the Interior Department to receive the land so it can act on the land-swap proposal by Collier. Plaintiffs have failed to demonstrate a likelihood of success on this claim because it is either not ripe for adjudication or is not a final agency action. As the 2001 ROD clearly indicates, the Air Force will consider Interior's request that the land be transferred to it only if the County does not receive the land either because it decides not to apply to the Air Force for the land or because the Air Force rejects the County's plan. The County has given notice that it is applying for the land, and the Air Force therefore never may have to consider Interior's request. Furthermore, as the Air Force explained in the 2001 ROD, even if it considers Interior's request it will not necessarily grant that request. Because this challenge relates to agency action that is not final and the claim is not ripe, plaintiffs have failed to show a likelihood of success on the merits.[4]

### C. Irreparable Harm

For the Court to grant a preliminary injunction, plaintiffs must make some showing that irreparable harm will result absent immediate intervention by the Court. The County advances essentially three arguments to demonstrate irreparable harm: (1) having to comply with an illegal agency decision is itself irreparable harm, (2) plaintiffs have to expend time, money and effort in preparing a mixed-use development plan for what the County contends is an illegal agency decision, and (3) the County will be unable to attract bidders for the mixed-use plan during the pendency of this litigation. The Court rejects all three arguments.

First, plaintiffs' argument that compliance with an illegal agency decision is *per se* irreparable harm is unsupported by the case they cite for that proposition. *See CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d at 746. Even if plaintiffs were correct, the Court has concluded that plaintiffs have not demonstrated a likelihood of success on their claims that the challenged agency actions were illegal, thus undercutting any argument that they have been irreparably harmed on this basis. Second, the expenditure of time, money and effort as alleged by plaintiffs is not the type of injury normally considered to be irreparable for purposes of a preliminary injunction. As the Supreme Court has said:

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray,* 415 U.S. 61, 88–90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). *See Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985). Finally, while there may be some possibility that bidders would

---

4. The HABDI plaintiffs also seek judgment on the ground that defendants have violated their Fifth Amendment equal protection and due process rights. The Court is unpersuaded that plaintiffs have a cognizable claim under the Fifth Amendment. To the extent that the Court has found little likelihood of success on the underlying claims—the preparation of the SEIS and the issuance of the 2001 ROD—the Court finds that there is little likelihood of success on the Fifth Amendment claim.

be dissuaded from helping the County develop a mixed-use plan during the pendency of the lawsuit, this is a highly speculative possibility. In fact, there may well be ample numbers of developers willing to get involved despite the lawsuit. Furthermore, to the extent that the litigation has created uncertainty, the County itself has helped create that uncertainty by initiating the litigation.[5]

### D. Balance of Harms and Public Interest

Plaintiffs do not devote substantial time discussing the balance of harms and the public interest, and the Court does not need to address these issues at length. Even if the Court assumes that plaintiffs' arguments are correct with respect to both of these factors, they fail to outweigh the Court's determination that plaintiffs have failed to demonstrate a likelihood of success on the merits or that they would suffer irreparable harm without a preliminary injunction.

An Order consistent with this Opinion will be issued this same day.

SO ORDERED.

### ORDER

This matter is before the Court on the motion for preliminary injunction filed by plaintiffs Miami Building & Construction Trades Council, AFL/CIO, and Homestead Air Base Developers, Inc. and on the motion for preliminary injunction filed by plaintiff Miami–Dade County. On May 3, 2001, the parties appeared before the Court for oral argument on the motions. Upon consideration of the briefs and supporting documentation filed by the parties and the oral arguments of counsel, and for the reasons stated by the Court in its Opinion issued this same day, it is hereby

ORDERED that the motion for preliminary injunction [10–1] filed by plaintiffs Miami Building & Construction Trades Council, AFL/CIO, and Homestead Air Base Developers, Inc. in Civil Action No. 01–0067 is DENIED; and it is

FURTHER ORDERED the motion for preliminary injunction [3–1] filed by plaintiff Miami–Dade County in Civil Action No. 01–0556 is DENIED.

SO ORDERED.

---

**5.** With respect to the HABDI plaintiffs, there appears to be no argument for irreparable harm except for time, money and effort— clearly the types of injuries that are insufficient to demonstrate irreparable harm.