

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-18-2007

# Rendell v. Rumsfeld

Precedential or Non-Precedential: Precedential

Docket No. 05-4740

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Rendell v. Rumsfeld" (2007). *2007 Decisions.* Paper 1159.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1159

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4740
_____

EDWARD G. RENDELL, In his official capacity as
Governor of the Commonwealth of Pennsylvania; ARLEN
SPECTER, In his official capacity as United States Senator;
RICK SANTORUM, In his official capacity as
United States Senator

v.

DONALD H. RUMSFELD, In his official capacity as
Secretary of Defense of the United States,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. No. 05-cv-03563)
District Judge:  The Honorable John R. Padova

_____

ARGUED NOVEMBER 6, 2006

BEFORE: SLOVITER, CHAGARES,
and NYGAARD, <u>Circuit</u> <u>Judges</u>.

(Filed:  April 18, 2007)
_____

H. Thomas Byron, III, Esq. (Argued)
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Washington, DC 20530
        <u>Counsel for Appellant</u>

Antoinette R. Stone, Esq. (Argued)
Brown Stone Nimeroff
1818 Market Street
Suite 2300
Philadelphia, PA 19103

Calvin R. Koons, Esq.
Daniel J. Doyle, Esq.
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
        <u>Counsel for Appellee</u>

_____

OPINION OF THE COURT

_____

NYGAARD, Circuit Judge.

Pennsylvania Governor Edward Rendell and other various elected officials brought an action in the District Court testing the legality of recommendations made by Secretary of Defense Donald Rumsfeld (hereinafter, Secretary) to deactivate the 111th Fighter Wing of the Pennsylvania National Guard. The District Court ruled that the Secretary's recommendations were invalid and the Secretary has appealed.

I.

The District Court addressed two issues on motions for summary judgment: first, whether the Secretary of Defense can legally recommend deactivating the 111th Fighter Wing without the prior consent of the Governor of Pennsylvania; and, second, whether the portion of the Department of Defense report that recommends deactivation of the 111th Fighter Wing is null and void because Governor Rendell did not consent to the deactivation. The District Judge concluded that the Secretary's recommendation violated 32 U.S.C. § 104(c), which reads:

> To secure a force the units of which when combined will form complete higher tactical units, the President may designate the units of the

3

National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State, the Commonwealth of Puerto Rico, the District of Columbia, Guam and the Virgin Islands. *However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.* (Emphasis added)

The District Court based its conclusion on the premise that the Secretary's *recommendation* was equivalent to a *change* and, hence, violated the italicized portion of the provision. On appeal the Secretary argues that the District Court's order should be vacated as moot; or in the alternative, that if not moot, should be reversed as non-justiciable.

We need not address the issue of justiciability because we conclude that the case is now moot. Hence we will vacate the District Court's February 7, 2005 Order, and remand the cause to the District Court with instructions to dismiss the case as moot. *See United States v. Munsingwear*, 340 U.S. 36, 39 (1950).

## II.

The facts germane to our review are neither complex nor extensive. They begin in 1990 when Congress enacted the Defense Base Closure and Realignment Act. (DBCRA) Its purpose was to "provide a fair process that will result in the timely closure and realignment of military installations inside

4

the United States," DBCRA, § 2901 (b).[1] Upon enactment, the DBCRA established the process for identifying military installations for closure and became "the exclusive authority for closure and realignment" of any such installation. DBCRA, § 2909(a). The DBCRA, *inter alia* required the Secretary of Defense to recommend to the Commission bases he had identified for closure. The DBCRA further required the Commission to hold public hearings on the Secretary's recommendations, prepare a report on his recommendations, and then publish its conclusions and recommendations as to which units should be deactivated and which bases should be closed.

The DBCRA required the Commission to send its conclusions and recommendations to the President, who was then obligated to issue his own report "containing his approval or disapproval of the Commission's recommendations." DBCRA § 2914(e)(1). The statute "does not at all limit the President's discretion in approving or disapproving the Commission's recommendations." *Dalton v. Specter,* 511 U.S. 462, 476 (1994). Nonetheless, the President could not select from among the Commission's recommendations piecemeal, but was required either to accept or reject the Commission's recommendations in their entirety. *Id.* at 470, DBCRA § 2903(e). The President's report (and list of recommended closures) was then to be sent to Congress with his certification

_____

1. The DBCRA was originally enacted as Part A of Title XXIX of Public Law 101-510, 104 Stat. 1808 (1990) and has since been amended. Citations in this opinion are to the text of the statute reprinted as a Note following 10 U.S.C. § 2687.

5

of approval.  The DBCRA gave Congress forty-five days in which to disapprove and reject the President's report, before it became final.  It is only when this process was complete and after the President's report became final that the Secretary of Defense was empowered to close any base, to deactivate any Wing or Unit, or to realign or combine any Wings or Units.

The process outlined above was followed precisely.  As required by the DBCRA, Secretary Rumsfeld sent his recommendations to the Commission.  The recommendation at issue in this case reads as follows:

> Close Naval Air Station Joint Reserve Base Willow Grove, PA. Relocate all Navy and Marine Corps Squadrons, their aircraft and necessary personnel, equipment and support to McGuire Air Force Base, Cookstown, NJ . . . Deactivate the 111th Fighter wing (Air National Guard) and relocate assigned A-10 aircraft [to other Air National Guard units].

On the same day that the District Court entered its order, the Commission met to consider the Secretary's recommendations.  The Commission was unanimous in its vote to strike the following language from the Secretary's report: "Deactivate the 111th Fighter Wing (Air National Guard) and relocate assigned A-10 aircraft to [other units]." Commission Transcript at 135-137.  The Commission's final report to the President incorporated these deletions. It also "encourage[d] the DoD to consider identifying A-10 aircraft to form an A-10 Wing or detachment using the 111th . . ." Commission Report at 96.

6

The report contained the following concerning the 111th's future:

> If the Commonwealth of Pennsylvania decides to change the organization, composition and location of the 111th Fighter Wing (ANG) to integrate the unit into the Future Total Force, all personnel allotted to the 111th Fighter Wing (ANG) . . .will remain in place and assume a mission relevant to the security interests of the Commonwealth of Pennsylvania and consistent with the integration of the unit in to Future Total Force. . .This recommendation does not effect a change to the authorized end-strength of the Pennsylvania Air National Guard. . .

Commission Report at 96-97.

The Commission then sent its Report to the President. He approved it and sent the Report to Congress with a letter that certified his approval of "all the recommendations contained in the Commission's report." The House of Representatives rejected a disapproval resolution by a vote of 324 to 85. The Senate never voted. Forty five days passed and the Commission's recommendations became law.

At this point, and only at this point, the Secretary became authorized to implement the Commission's recommendations, the President's Report, and the final Act of Congress. Congressional authority for the Commission expired on April 15, 2006, and the Commission ceased to exist.

7

III.

As noted, Governor Rendell, Senators Specter and Santorum filed suit against Secretary Rumsfeld contending that 32 U.S.C. § 1049(c) forbade any "change in the branch, organization or allotment of a [National Guard] unit located entirely within a State . . without the approval of that State's governor." They sought a declaration that "Secretary Rumsfeld may not, without first obtaining Governor Rendell's approval, deactivate the 111[th] Fighter Wing." The District Court's order granting summary judgment for plaintiffs declared that;

a. Secretary Rumsfeld, by designating the 111th Fighter Wing of the Pennsylvania National Guard [for deactivation] without first obtaining the approval of governor Rendell, has violated 32 U.S.C. § 104 (c).

b. The portion of the [Secretary's] report that recommends deactivation of the 111th Fighter Wing of the Pennsylvania Air National Guard is null and void.

IV.

We have an independent obligation at the threshold to examine whether we have appellate jurisdiction. *Lorillard Tobacco Co. v. Bisan Food Corp.* 377 F.3d 313, 318 (3d Cir. 2004) (citing *Gov't of V.I. v. Hodge*, 359 F.3d 312, 317 (3d Cir. (2004)). Our mootness analysis "traditionally begins with 'the requirement of Article III of the Constitution under which the

8

exercise of judicial power depends upon the existence of a case or controversy.'" *Intn'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 914 (3d Cir. 1987) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)). The existence of a case or controversy, in turn, requires " '(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution.' " *Id.* at 915 (quoting *Dow Chem. Co. v. EPA*, 605 F.2d 673, 678 (3d Cir.1979)). "The central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *In re Surrick*, 338 F.3d 224, 230 (3d Cir. 2003).

Moreover, it does not matter when the case becomes moot. The requirement that a case or controversy be "actual [and] ongoing" extends throughout all stages of federal judicial proceedings, including appellate review. *Khodara Envtl., Inc. v. Beckman*, 237 F.3d 186, 193 (3d Cir. 2001). Hence, if a case becomes moot after the District Court enters judgment, an appellate court no longer has jurisdiction to review the matter on appeal. *Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895). In other words, would the District Court's declaration "serve [any] purpose today[?]" *Khodara,* 237 F.3d at 194.

The only issue raised by the Governor's complaint and addressed by the District Court's opinion and order was the legality of the Secretary's recommendation to deactivate the

9

111th Fighter Wing. "This action arises out of the Department of Defense's . . attempt. . .to deactivate the 111[th] Fighter wing . . ." App. at 75. The District Court's order declares that "[t]he portion of the [Secretary's] report that recommends deactivation. . . is null and void." App at 54. However, neither the Secretary's recommendation nor the District Court's declaration have any vitality, nor would they "serve [any] purpose today." *Khodara* 237 F.3d at 194. The Commission rejected the Secretary's recommendation. Indeed in its Report it stated that "[i]f the Commonwealth of Pennsylvania decides to change the organization, composition and location of the 111[th] Fighter Wing. . ., all personnel allotted to the 111[th] Fighter Wing . . . will remain in place and assume a mission relevant to the security interests of [Pennsylvania]." Commission Report at 96-97.

We conclude that there is simply no controversy remaining here. Secretary Rumsfeld did not change anything – nor was he empowered to do so. The *recommendation* he made to the DBCRA to deactivate the 111th Fighter Wing was not a *change*; and not followed by the Commission or the President, or was never considered by Congress. The Commission's Recommendations, the President's Report, and Congress' acquiescence have fully nullified Secretary Rumsfeld's recommendation, and rendered the District Court's declaration wholly unnecessary.

V.

Moreover, the Governor's challenge does not fall within any of the recognized exceptions to the mootness doctrine.

10

Under the "capable of repetition" exception, for example, a court may exercise its jurisdiction and consider the merits of a case that would otherwise be deemed moot when "(1) the challenged action is, in its duration, too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *see also In re Price*, 370 F.3d 362, 381 (3d Cir. 2004) (Sloviter, J., *dissenting*). The exception from the mootness doctrine for cases that are technically moot but "capable of repetition, yet evading review" is narrow and available "only in exceptional situations." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109, (1983); *Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975).

The Governor argues that the life of the Secretary's recommendation was really too short to be litigated before it expired and thus, incapable of review. He may be right. However, the duration of the life of the Secretary's recommendation is not significant because there is no reasonable likelihood that the alleged harm will occur again to the same complaining parties. *See Belitskus v Pizzingrilli,* 343 F.3d 632, 648 (3d Cir. 2003). The recently completed process under the DBCRA was the final round of closures permitted by the statute. Federal law no longer provides a mechanism for the Secretary to repeat the alleged harm, nor does it even provide for the continued existence of a Base Closure and Realignment Commission. *See* DBCRA, § 2912(d)(4) ("the Commission appointed under the authority of this subsection shall meet during the calendar year 2005 and shall terminate on April 15, 2006."). In *Khodara, supra*, we noted with approval the Fourth

11

Circuit Court of Appeals holding that "statutory changes that discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the law suit is dismissed." *Khodara,* 237 F.3d at 194 (citing *Valero Terrestrial Corp., v. Paige*, 211 F.3d 112, 116 (4th Cir. 2002) (quoting *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994).

Further, we have clearly held that a party can rarely, if ever, be injured by a proposed base closing before a decision is made to close that base. Any actions of the Secretary of Defense and the Commission before the President's decision are merely preliminary in nature. *Specter v. Garrett*, 971 F.2d 936, 946 (3d Cir. 1992) *vacated on other grounds* 506 U.S. 969 (1992). Nothing has changed to alter the basic tenets of this holding and it is controlling in this appeal. For the alleged harm to occur again Congress would have to pass another law calling for a new round of base closures; the new law would have to give the Secretary a recommending role similar to the one at issue here; and the new Secretary would again have to recommend deactivating the 111th Fighter Wing. It would be speculation upon speculation were one to attempt a prediction whether a future Congress may re-authorize another new Commission; whether a new Secretary of Defense may recommend that the 111th Fighter Wing of the Pennsylvania National Guard at Willow Grove be deactivated; or what a new Base Closure Commission would do about it; and whether the next President would thereafter approve deactivation. There is simply no likelihood at all that this, or a future Governor of

12

Pennsylvania "will be subject to the same action again." *Belitskus,* 343 F.3d at 648.[2]

Nonetheless, a District Court's judgment is vacated "only where mootness has occurred through happenstance – circumstances not attributable to the parties." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); *New Jersey Turnpike Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 26-27 (3d Cir. 1985). This is known as the voluntary-cessation doctrine and is another exception to mootness. "Mere voluntary cessation of allegedly illegal conduct does not moot a case." *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968).

The reasons for this are patent and related to the "capable of repetition yet evading review" exception. That is to say if we were to hold such a case moot "the courts would be compelled to leave the defendant free to return to his old ways." *Id.* Consequently, if the defendant ceases the harm, the case retains vitality unless, "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be

---

2. It is worth noting in the margin that during the pendency of this appeal, Secretary Donald Rumsfeld has resigned and his replacement confirmed by the Senate; Senator Santorum has been defeated for reelection; control of the Congress that enacted the expired DBCRA has shifted from Republican to Democratic control; and, before a new Commission could be activated, a new president will have been elected.

expected to recur." *Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189 (2000).

The purpose of this exception is to prevent defendants from "forever. . .avoid[ing] judicial review simply by ceasing the challenged practice, only to resume it after the case [is] dismissed." *Northeastern FL Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 676 (1993) (O'Connor, J., dissenting).

Here the only defendant is Secretary Rumsfeld, and he has not voluntarily ceased anything. As noted, he made a recommendation that was roundly rejected. The Commission*,* the President, and Congress – all non-parties – have defused the gravamen of the plaintiffs' complaint and effectively nullified the District Court's declaratory order. Here, the voluntary-cessation exception simply does not apply.

## VI.

Because this case is moot, and no exceptions apply, we must decide upon the appropriate remedy. The Supreme Court's decision in *United States v. Munsingwear* supplies the general rule: "The established practice . . . in dealing with a civil case. . . which has become moot while [under review] is to reverse or vacate the judgment below and remand with a direction to dismiss." 340 U.S. at 39. The *Munsingwear* rule is an equitable one that is "commonly used to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *Donovan ex rel. Donovan v. Punxsutawney Area*

*School Bd.*, 336 F.3d 211, 217 (3d Cir. 2003) (citing *Munsingwear*, 340 U.S. at 41).

Where as here, the case became moot through the "vagaries of circumstance[s]" not attributable to the defendant, *Munsingwear* controls, and the general rule of vacatur is specifically indicated. *U.S. Bancorp Mortgage Co., v. Bonner Mall P'ship.,* 513 U.S. 18, 25 (1994). Therefore, we conclude that this case meets the test for vacatur. Once again, we find our decision in *Khodara* instructive. In *Khodara,* the case became moot while on appeal because Congress repealed the challenged law. We reasoned that legislative repeal of a challenged law did not suggest either manipulation of the legal system, or an attempt to erase an unfavorable precedent. *Khodara* 237 F.3d at 194-195. Like the Congressional repeal in *Khodara,* the Commission here was fulfilling its statutory role — not attempting to manipulate the system — and there is nothing on this record to indicate that Congress was aware of the District Court's order. On balance, we conclude that it is most equitable to "wipe the slate clean," and eliminate the possibility of any adverse legal consequences. *See Munsingwear*, 340 U.S. at 40 (stating vacatur "clears the path. . . and eliminates a judgment, review of which was prevented through happenstance.").

## VII.

In summary, because this case is moot, we will VACATE the District Court's February 7, 2005 order and REMAND the cause to the District Court with instructions to dismiss the case as moot.

15

SLOVITER, <u>Circuit Judge</u>, Dissenting.

If the issue before us were a dispute between individuals, or between companies, or between one or more individual and one or more company, I would join Judge Nygaard's fine opinion for the majority without hesitation. But the issue underlying the dispute between Governor Rendell and the Secretary of Defense is not confined to ordinary litigation. The seeds of the difference between the parties goes back to the very beginning of our existence as a nation, and it must be understood in that context. I do not think it can or should be resolved by the expedient of declining to consider the merits under the rubric of mootness.

**I.**

History of the National Guard

The differences between the states and the federal government, generally viewed as between the Federalists and the Anti-Federalists, in the days before and after the ratification of the Constitution that pervaded many of its provisions extended as well to the manner in which the security of the new nation should be ensured. Historians note that the Articles of Confederation required the States to "always keep up a well

16

regulated and disciplined militia[.]"[3] Whereas the Constitution gives Congress the power "[t]o raise and support Armies"[4] as well as the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service or the United States," the same clause "reserves to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the Authority of training the Militia according to the discipline prescribed by Congress[.]" The "Militia" referred to in the Constitution became, in time, the National Guard. Thus it is evident that even at the very inception of this country and despite the tensions between those favoring the national government and those favoring the States in the contests between them, there was general recognition of the role of the states over what was to become the National Guard.

The history of the National Guard is long and complex.[5] It has been detailed in the opinion of the Supreme Court in Perpich v. Department of Defense, 496 U.S. 334, 340 (1990), and I refer only to certain details of relevance to the case before

---

3.     John K. Mahon, History of the Militia and the National Guard 46 (Louis Morton ed., 1983) (quoting Article of Confederation VI).

4.     U.S. Const. art. I, § 8.

5.     See, e.g., Mahon, supra note 1; Jerry Cooper, The Rise of the National Guard, The Evolution of the American Militia, 1865-1920 (1997).

17

us.  The earliest legislation, The Militia Act of 1792, contained provisions with respect to the state militias and required annual reporting by the State adjutant generals to the State governors and the President.[6]  In 1901, after 111 years of inactivity, Congress repealed The Militia Act and in 1903 it enacted The Dick Act,[7] which was designed to provide for a national reserve force to be provided by what had come to be called the National Guard. Significantly for our purpose, in the beginning there could be no provision of federal arms or joint maneuvers with the regulars unless and until the state governor requested such aid and support.[8]

There were various amendments and recurring tensions between the states and federal government regarding funding and control over the National Guard, such as whether the infusion of federal funds entitled the federal government the right to call on the National Guard outside the United States (in

---

6.      The history of the militias is discussed in a student comment and casenote, Jason A. Coats, Base Closure and Realignment: Federal Control Over the National Guard, 75 U. Cin. L. Rev. 343, 347 (2006), which takes its historical material primarily from two more objective sources, the treatises by Mahon, supra note 1, and Cooper, supra note 3.

7.      So named for Major General Charles Dick.  Mahon, supra note 1, at 139.

8.      Id.

the anticipated conflict with Mexico).[9] This persisted even after the enactment of The National Defense Act of 1916.[10]

As noted in the Perpich opinion, the 1916 statute provided that the Army of the United States was to include not only "the Regular Army" but also the National Guard while in the service of the United States. Perpich, 496 U.S. at 343-44. The Court also noted that other issues were remedied by the 1933 amendments that created as "two overlapping but distinct organizations" the National Guard of the various states and the National Guard of the United States. Id. at 345 (internal quotation marks omitted). What is now section 32 U.S.C. § 104(c) is the combined product of the National Defense Act of 1916 and the amendments enacted in 1933. Since the 1933 amendments there has been dual enlistment: any person enlisting

---

9. See Cooper, supra note 3, at 114-15.

10. Cooper describes the conflict as follows: "From the Spanish-American War through 1915, Guardsmen sought increased federal financial aid, statutory recognition as the nation's first-line reserve, and retention of their central role in manpower policy. At the same time, they defended long-established rights to select officers and organize units as they saw fit and asserted a right to make military policy when it affected the state soldiery." Id. at 153.

in a State National Guard unit has simultaneously enlisted in the National Guard of the United States.[11] Perpich, 496 U.S. at 345.

I leap forward because the history of the National Guard is of relevance to us only to the extent that it impacts on the majority's decision not to consider the merits of the position of Governor Rendell that his statutory right to be consulted and give consent to the closure of the National Guard base (or unit) has been ignored.[12] A 1977 statute that dealt with the closing or realignment of military installations and its amendments was superceded by the 1988 statute that established the Commission on Base Realignment and Closure ("BRAC").[13] It fell to the Secretary of Defense to implement the recommendations unless Congress disapproved. The Defense Base Closure and

---

11.     The holding in Perpich that "Congress may authorize the President to order members of the National Guard to active duty for purposes of training outside the United States during peacetime without either the consent of a State Governor or the denomination of a national emergency," 496 U.S. at 336, is not at issue here.

12.     Military Construction Authorization Act, 1978, Pub. L. No. 94-431, 90 Stat. 1349 (1977).

13.     Defense Authorization Amendments and Base Closure and Realignment Act, Pub. L. No. 100-526, 102 Stat. 2623 (codified as amended at 10 U.S.C. § 2687 (1998 & Supp. 2006)).

Realignment Act of 1990,[14] (the "BRAC Act") was designed "to provide a fair process that will result in the timely closure and realignment of military installations inside the United States."[15] That Act was further amended in 2005, giving the BRAC a significant role in reviewing the Secretary's recommendations for closure and realignment of facilities.[16] Notably, however, nothing in the BRAC Acts and the predecessor statutes purported to amend or supercede the provision of 32 U.S.C. § 104(c) that provides that "no change in the branch, organization, or allotment of a [National Guard] unit located entirely within a State <u>may be made without the approval of its governor</u>." 32 U.S.C. § 104(c) (emphasis added).

Pursuant to the BRAC Act, the Secretary of Defense, after considering factors set forth in the statute,[17] is required to

---

14. Defense Base Closure and Realignment Act of 1990, Pub. L. No. 101-510, §§ 2901-11, 104 Stat. 1808 (portions codified at 10 U.S.C. § 2687 note (1998)).

15. <u>Id.</u>, 104 Stat. at 1808.

16. National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, §§ 3001-3006, 115 Stat. 1012, 1342-51 (2001) (codified at 10 U.S.C. § 2687 note (Supp. 2006)).

17. The Act provides that the final selection criteria "to be used by the Secretary in making recommendations for the closure or realignment of military installations inside the United States . . . shall be the military value and other criteria specified

(continued...)

submit to the BRAC Commission a list of military installations within the United States that are recommended for closure or realignment. Pub. L. No. 107-107, 115 Stat. at 1346. The Act provides that "the Secretary shall consider any notice received from a local government in the vicinity of a military installation that the government would approve of the closure or realignment of the installation." Id.

"After receiving the recommendations from the Secretary pursuant to subsection (c) for any year, the Commission shall conduct public hearings on the recommendations." Pub. L. No. 101-510, 104 Stat. at 1811. The BRAC Commission must thereafter transmit its report, "containing its findings and conclusions[ ] based on a review and analysis of the Secretary's recommendations" to the President. Pub. L. No. 107-107, 115 Stat. at 1346. The President is then required to prepare a report containing his approval or disapproval of the Commission's recommendations. Id. at 1347. If the President disapproves the Commission's recommendations, the Commission may prepare a revised list of recommendations and transmit those to the President. Id. If the President disapproves the revised recommendations, the BRAC process for 2005 is terminated. Id. If the President approves either the original or revised recommendations, he must send the approved list and a certification of approval to Congress. Id. If Congress does not enact a resolution disapproving the approved recommendations within 45 days after receiving the President's certification of

17. (...continued)
in subsections (b) and (c)."

22

approval, the Secretary must carry out all of the recommendations.  Pub. L. No. 101-510, 104 Stat. at 1812.


## II.


The Present Action

The action before us was filed by Edward G. Rendell, Governor of the Commonwealth of Pennsylvania, and Pennsylvania's two senators, Arlen Specter, and Rick Santorum, challenging the legality of the recommendation made by the then- Secretary of Defense Rumsfeld to the BRAC Commission (the "BRAC DoD Report").  The essence of the lawsuit is described in the excellent detailed opinion of District Judge John Padova of the Eastern District of Pennsylvania.  Because Judge Padova's opinion is not reported in the West Reporter system and is available only on online services, I quote from it in more detail than would be usual.  Judge Padova explained:

> In the BRAC DoD Report, Secretary Rumsfeld recommended that the Naval Air Station Joint Reserve Base Willow Grove, Pennsylvania, be closed.  In connection with this closure, he recommended that "all Navy and Marine Corps squadrons, their aircraft and necessary personnel, equipment and support" be relocated to McGuire Air Force Base, Cookstown, New Jersey.  He further recommended that the Pennsylvania Air National Guard's 111th Fighter Wing, which is stationed at the Willow Grove Naval Air Station, be deactivated and that half of its assigned A-10 aircraft be

23

relocated to different Air National Guard units in Idaho, Maryland and Michigan, while the remainder of the aircraft be retired.

The 111th Fighter Wing is an operational flying National Guard unit located entirely within the Commonwealth of Pennsylvania with 1023 military positions. Deactivation of the 111th Fighter Wing would deprive the Governor of nearly 1/4th the total strength of the Pennsylvania Air National Guard and would deprive the Governor and Commonwealth of a key unit with the current capability of addressing homeland security missions in Southeastern Pennsylvania. Deactivation of the 111th Fighter Wing would be the *ultimate* change in the branch, organization or allotment of the unit. In May 2005, and at all times subsequent to Secretary Rumsfeld's transmittal of the BRAC DoD Report to the Defense Base Closure and Realignment Commission (the "BRAC Commission"), "the overwhelming majority of the 111th Fighter Wing was not and currently is not in active federal service."

Neither Secretary Rumsfeld nor any authorized representative of the Department of Defense requested Governor Rendell's approval to change the branch, organization, or allotment of the 111th Fighter Wing, or requested Governor Rendell's consent to relocate or withdraw the 111th Fighter Wing during the 2005 BRAC process. Governor Rendell sent a letter to Secretary Rumsfeld on May 26, 2005, officially advising the Secretary that he did not consent to the deactivation,

24

relocation or withdrawal of the 111th Fighter Wing. Deputy Assistant Secretary of the Air Force Gerald F. Pease, Jr. replied to the Governor's letter on July 11, 2005, but did not address the Secretary's failure to obtain the Governor's prior consent to the recommendation that the 111th Fighter Wing be deactivated.

2005 WL 2050295, at *1-2 (E.D. Pa. Aug. 26, 2005) (footnote omitted) (internal citations omitted).

The District Court considered and rejected the arguments by the Secretary in support of dismissal of the complaint. In response to the Secretary's argument that Governor Rendell did not have standing because he had not suffered an imminent injury that is concrete, the District Court stated:

In this case, assuming that the Governor is correct about the merits of his claim, he had the statutory right to disapprove changes to the branch, organization or allotment of a unit of the National Guard located wholly within the Commonwealth, and his disapproval would have been sufficient to prevent the deactivation recommendation from going to the BRAC Commission. His right to prior approval or disapproval has, however, been completely nullified by the Secretary's recommendation. We find that the injury suffered by the Governor is the type of concrete and particularized injury contemplated by *Coleman* [*v. Miller, 307 U.S. 433 (1939)*]. We further find that this injury is, in fact, traceable to the Secretary's recommendation to deactivate the 111th Fighter Wing and that this injury may be

25

redressed by the requested relief, *i.e.*, an order declaring that Secretary Rumsfeld has violated federal law by designating the 111th Fighter Wing for deactivation without first obtaining the approval of Governor Rendell and an order declaring that the portion of the BRAC DoD Report that recommends deactivation of the 111th Fighter Wing is null and void. Accordingly, we find that Governor Rendell has standing to assert the claims alleged in the Complaint.

Id. at *9 (internal citations omitted).

In response to the Secretary's assertion that the claims asserted in the complaint are not ripe, the District Court analyzed the three factors relevant to a ripeness determination: the adversity of the parties' interest, the conclusiveness of the judgment, and the utility of the judgment. Id. at *10. As to adversity, the Court stated that "Governor Rendell suffered an injury in fact with respect to the derogation of his statutory power to consent to or to disapprove changes to the branch, organization or allotment of a unit of the National Guard located wholly within the Commonwealth," id., and found that the adversity prong is satisfied. With respect to the conclusiveness inquiry, the District Court stated:

No party disputes that the 111th Fighter Wing is a unit of the Pennsylvania Air National Guard; that it is presently under state control; that the Secretary recommended deactivation of the 111th Fighter Wing in his Report to the BRAC Commission; and that he did not seek or obtain Governor Rendell's prior approval to do so. The

26

claims asserted in the Complaint present solely legal issues, obviating the need for future factual development. A declaratory judgment would conclusively determine whether the Secretary of Defense can legally recommend deactivating the 111th Fighter Wing without Governor Rendell's prior approval. We find, accordingly, that the conclusiveness prong is satisfied in this case.

Id.

Finally, the Court turned to the utility inquiry and concluded:

The utility inquiry focuses on the hardship to the parties of withholding decision and whether the claim involves uncertain and contingent events. In determining utility, the Court examines "whether the parties' plans of actions are likely to be affected by a declaratory judgment. Governor Rendell is the commander-in-chief of the Pennsylvania National Guard, including 111th Fighter Wing. 51 Pa. Cons. Stat. Ann. § 501. As commander-in-chief, the Governor has the power to accept allotments of military personnel and equipment from the Department of Defense for the Pennsylvania National Guard; carry out training of the Pennsylvania National Guard; establish the location of any assigned, authorized units of the Pennsylvania National Guard; organize or reorganize any organization or unit of the Pennsylvania National Guard; and place the Pennsylvania National Guard on active duty during an emergency in this Commonwealth. 51 Pa. Cons. Stat. Ann. §§ 502-505, 508. A declaratory

27

judgment determining the legality of the Secretary's recommendation to deactivate the 111th Fighter Wing–a unit that constitutes 1/4 of the personnel of the Pennsylvania Air National Guard–clearly would effect the Governor's ability to carry out his powers as commander-in-chief, particularly his ability to call members of the 111th Fighter Wing to active duty in the case of an emergency in this Commonwealth. We find, therefore, that the utility prong is satisfied in this case.

Id. at *11.

Having rejected the Secretary's motion to dismiss on the grounds referred to above, the District Court then considered the application of Dalton v. Specter, 511 U.S. 462, 466 (1994), where the Supreme Court rejected a challenge to the President's decision, pursuant to the 1990 BRAC Act, to close the Philadelphia Naval Shipyard. The District Court held that Dalton did not bar Governor Rendell's action because, unlike the complaint in Dalton, the complaint by Governor Rendell was not brought pursuant to the Administrative Procedure Act. Rendell v. Rumsfeld, 2005 WL 2050295, at *11. The District Court then turned to the concurring opinion in Dalton written by Justice Souter which essentially concluded that "the text, structure, and purpose of the Act" manifest that the Act forecloses judicial review. Id. at *13; Dalton, 511 U.S. at 479. The District Court differentiated the issue in Dalton from that before it, stating:

The Secretary's recommendation to close the Willow Grove Naval Air Station has not been challenged in this

28

lawsuit. What has been challenged is the legality of his further recommendation that the 111th Fighter Wing be deactivated. The parties have pointed to nothing in the express language, structure, objectives, or legislative history of the laws pursuant to which this case has been brought that prohibits judicial review. Accordingly, we find that the structure, objectives, and legislative history of the BRAC Act do not prohibit judicial review of the legality of the Secretary's recommendation to deactivate the 111th Fighter Wing.

Rendell v. Rumsfeld, 2005 WL 2050295, at *14. After considering the merits of the complaint on the opposing motions for summary judgment, the District Court granted the Commonwealth's motion for declaratory judgment and held as follows:

a. Secretary Rumsfeld, by designating [for deactivation] the 111th Fighter Wing of the Pennsylvania Air National Guard without first obtaining the approval of Governor Rendell, has violated 32 U.S.C. § 104(c).

b. The portion of the BRAC DoD Report that recommends deactivation of the 111th Fighter Wing of the Pennsylvania Air National Guard is null and void.

Id. at *21-22.

There are many issues decided by the District Court that merit appellate review. Unfortunately, the majority opinion

29

does not discuss them. Instead, it has chosen to grant the Secretary's motion to dismiss this appeal on the basis of mootness. The majority holds that because the Commission voted to strike from the Secretary's recommendation the deactivation of the 111th Fighter Wing (Air National Guard) and the relocation of the assigned aircraft elsewhere, which recommendation was approved by the President without rejection by Congress, thereby becoming law, the case is now moot. The majority states that in light of those events, the District Court's declaration that the "portion of the [Secretary's] report that recommends deactivation of the 111th Fighter Wing of the Pennsylvania Air National Guard is null and void" is "wholly unnecessary." Maj. Op. at 15.

The majority recognizes that one of the principal exceptions to the mootness doctrine is the one covering the situation when the issue is "capable of repetition, yet evading review." The majority holds that exception is inapplicable here because "there is no reasonable likelihood that the alleged harm will occur again." Maj. Op. at 17. The majority reasons that the harm was that of the Secretary's recommendation with respect to base closings, a harm that cannot recur unless Congress were to pass another statute calling for a new round of base closures with procedures similar to those in the statute leading to the Secretary's recommendation to deactivate the 111th Fighter Wing. I am not as sanguine as the majority that there will be no decision in the near future to reconsider where military bases should be placed or replaced in light of the uncertain world

30

situation and the deployment of National Guard Units to combat zones.[18]

## III.

## The Issue on Appeal

In response to the Secretary's argument that the matter before us is moot, Governor Rendell argues that by including in the recommendation to the BRAC Commission the removal of all of the 111th Fighter Wing's aircraft, a recommendation that was untouched when the BRAC Commission forwarded the recommendation to the President, the result would be the constructive deactivation of the 111th Fighter Wing. Therefore, argues the Governor, the matter is not moot because if the 111th

18.     Moreover, I note that Governor Rendell's affidavit states that the Department of the Navy has issued two Notices of Availability of Navy Real Property, one on November 15, 2005 and the other on January 17, 2006, which included all of the real property at Willow Grove as available for acquisition by the other federal agencies. Despite the BRAC requirement that an enclave be established for the 111th sufficient to support flight operations, the second Notice stated that if there was no interest by a federal agency, the property would be available for private development. The Department of the Navy also notified the Governor's staff that, notwithstanding the enclave requirement, the Navy believed  that there was no need to keep the airfield because the A-10 aircraft assigned to the 111th would be taken away. See Rendell Aff. ¶¶ 3-7.

31

aircraft were taken without replacing the allotted planes, the unit would be made inactive and ineffective.

I, for one, have had some difficulty understanding the Governor's position on this appeal with respect to the aircraft. On one hand, the Governor appears to have disclaimed any challenge to the movement of the aircraft or to the actions of the Commission on this appeal. When questioned about that at oral argument the Governor's counsel stated that the effect of the removal of the aircraft would be that the "mission" of the 111th Fighter Wing would be taken away. Tr. at 22-23. Counsel later stated "[w]e're challenging not the taking away of these particular planes but the taking away of planes for all time. We're taking away their ability to fly, if you can understand it that way[.]" Tr. at 24. Counsel for the Governor stated that the final documents signed by the President contained, inter alia, the recommendation to "[d]istribute the 15 A-10 aircraft assigned to [the] 111th Fighter Wing. And it goes on to say that they [would] be distributed to various other locations, Boise Air Terminal Air Guard Station, Martin State Airport Air Guard Station, and so on." Tr. at 24-25. I find it difficult to reconcile that argument with the Governor's failure to raise the distribution of the aircraft in the District Court.

However, I look at the issue in this case as a broader one than that identified by the majority. I understand Governor Rendell to have challenged the Secretary's action because the Secretary failed to follow the requirement of 32 U.S.C. § 104(c) to seek and await the Governor's approval to any "change in the branch, organization, or allotment of a [National Guard] unit located entirely within [the Commonwealth.]" That challenge

32

is made clear and patent in the Governor's brief on appeal and in the oral argument made by the Governor's counsel. Counsel for the Secretary parried our inquiry. He argued, alternately, that the Governor's challenge was initially made at a time when it was not ripe, as all the Secretary had done was make a recommendation to the Commission. He later argued that a challenge made after the President approved the Commission's recommendation and sent it to Congress could not be heard under the precedent of Dalton v. Specter, 511 U.S. 462 (1994). Finally, in response to this court's persistent questions on that issue, counsel for the Secretary finally conceded that "we believe, that there is no judicial review." Tr. at 40.

I dissent from the majority's decision because it evades deciding whether § 104(c) retains any effect. The District Court held that the Governor's right to prior approval or disapproval has been "completely nullified by the Secretary's recommendation." Rendell v. Rumsfeld, 2005 WL 2050295, at *9. The Secretary argues that "[a]dding a gubernatorial consent requirement (drawn from § 104(c)) would interfere with the Base Closure Act[.]" Govt's Br. at 29-30. The Governor responds that the Base Closure Act expressly superseded some federal statutes relating to base closings, but contains no such provision with respect to the gubernatorial consent statutes.

I have reached no decision with respect to the conflicting arguments but it is a significant issue, one between the rights of the states and the federal government harkening back to the very foundation of our government. Concededly, the Governor's obligation to provide for the civil defense of the people and property of Pennsylvania in this era of threats to the homeland

33

may require calling on the National Guard.  I dissent from the majority's choice not to consider the merits of this issue.  To paraphrase Rabbi Hillel, "if not now, when?"